**Raymond SHOWERY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–83–00373–CR.**

Court of Appeals of Texas, El Paso.

May 8, 1985.

Rehearing Denied June 5, 1985.

Michael R. Gibson, El Paso, for appellant.

Steve W. Simmons, Dist. Atty., El Paso, for appellee.

Before STEPHEN F. PRESLAR, C.J., and WARD and SCHULTE, JJ.

## OPINION

WARD, Justice.

Appellant was convicted of murder and the jury assessed punishment at confinement in the Texas Department of Corrections for fifteen years. We affirm.

At the outset, we note that this is not an appeal from a conviction for criminal abortion. This is not an appeal from a conviction for destroying an unborn child under Tex.Rev.Civ.Stat.Ann. art. 4512.5 (Vernon 1976). *Hardin v. State*, 52 Tex.Cr.R. 238, 106 S.W. 352 (1907). This is not an appeal from causing the death of either a fetus or a child by omitting to perform a duty imposed by law for the preservation of life. This is an appeal from a conviction under Tex.Penal Code Ann. sec. 19.02(a)(1) (Vernon 1974), for an alleged affirmative act of murder directed against a newborn infant, and the judgment must rise or fall upon the proven merits of such an allegation.

The jury in this case returned a verdict of guilty under Count I of the indictment, alleging that the Appellant did "intentionally and knowingly cause the death of an individual ... by covering the said individual's face, and by submerging the said individual in a bucket that contained a liquid, and by placing the said individual in a plastic bag...." The State's theory, proof of which is discussed below, was that Ap-

pellant, a physician, performed an abortion by hysterotomy in which the fetus was withdrawn alive, and that the Appellant then caused the death of the newborn by exercising various means of suffocating it (placing the placenta over its face, immersing it in liquid and sealing it in a plastic trash bag).

Grounds of Error Nos. One and Three challenge the constitutionality of this prosecution due to the incorporation of an overbroad Family Code definition of "born alive." In the charge to the jury, the trial court defined "[i]ndividual" as "a human being who has been born and is alive." Tex.Penal Code Ann. sec. 1.07(a)(17) (Vernon 1974). The charge also defined "[b]orn alive" in accordance with Tex.Family Code Ann. sec. 12.05(b) (Vernon Pamphlet Supp. 1975–1985) as:

[T]he complete expulsion or extraction from its mother of a product of conception, irrespective of the duration of pregnancy, which, after such separation, breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached; each product of such a birth is considered born alive.

Appellant objected to the latter definition, relying upon *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 82–84, 96 S.Ct. 2831, 2847–2848, 49 L.Ed.2d 788, 812–813 (1976), on grounds of unconstitutional overbreadth in relationship to viability as established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Appellant points out that following the Supreme Court decision in *Roe*, the Texas legislature did not attempt to enact a new criminal abortion statute. He argues that the State has sought to supply such a statute by a murder prosecution under the Penal Code, incorporating an unconstitutionally overbroad Family Code concept of cognizable life as an individual. Appellant further suggests that the issue raised necessitates a resolution of "when life begins in Texas." Asserting that no case law

exists addressing the issue, he invites this Court to apply the concepts expressed in *Roe* and *Danforth* to determine whether or not this criminal prosecution was improperly brought against conduct directed at a non-individual.

We have previously noted what is not involved in this appeal. We further find that the viability issues established in *Roe, Danforth* and *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), are not relevant to the review of this case. Appellant contends that the joint application of the Family Code and Penal Code provisions is an effort to extend criminal sanctions to conduct toward a fetus which had not attained a constitutionally cognizable stage of development so as to be considered an individual. He contrasts the signs of life elements of Family Code Section 12.05 with the viability standard set out in *Roe* and *Danforth.* He then assesses the evidence of viability in this record, seeking to demonstrate that the conviction is founded upon conduct affecting a nonviable fetus.

We agree with Appellant's contention that the murder statute found in the Penal Code cannot constitutionally apply to a nonviable fetus. Any such attempted application, either directly or by incorporation of some Family Code concept, would not pass the tests established by the Supreme Court. We decline to follow the remainder of the argument urged by Appellant.

Section 19.02 of the Penal Code proscribes causing the death of an individual, a human being who has been born and is alive at the time of the alleged conduct of the defendant. Section 12.05 of the Family Code extends the same rights, powers and privileges under the laws of this State as are granted to a child born alive after normal gestation to "[a] living human child born alive after an abortion or premature birth...." That provision was expressed to the jury in Paragraph III of the charge. The court went on in Paragraph IV to define "[b]orn alive" as indicated above. Reading Family Code Section 12.05(a) and Penal Code Section 19.02 together, it is apparent that the jury was not simply permitted to find that the child had been "born alive" under 12.05(b) standards, amounting to less than viability. The jury was required to find that the individual allegedly murdered by the Appellant had been born alive and was alive at the time of the alleged misconduct. This is the only reasonable manner of reading Section 12.05(a) without finding a redundancy in describing a "living human child born alive." To forestall any suggestion that this interpretation is also redundant, since subsequent life necessitates live birth, we point out that the legislature could reasonably have intended to distinguish criminal conduct at this stage of the birth process from that targeted by Tex.Rev.Civ.Stat.Ann. art. 4512.5 (Vernon 1976). That provision was not invalidated in *Roe.* The question of its constitutionality is not before us, but its current vitality is of assistance in assessing the applicable scope of Sections 12.05 and 19.02. Article 4512.5 prohibits destroying the "vitality or life in a child *in a state of being born and before actual birth,* which child would otherwise have been born alive." A prosecution under that statute might necessitate an analysis in terms of viability under *Roe, Danforth* and *Colautti.* Our present case does not. The prosecution in this case alleged and was required to prove not only live birth as defined in Section 12.05(b) but traditional concepts of life at the time of Appellant's conduct.

Appellant's analysis of viability and the evidence thereof in this case is simply inapplicable. The cardinal issue in the three cited Supreme Court cases was viability.

> Viability ... the determinant as to when the State has a compelling interest in the life or health of the fetus.

*Colautti,* 439 U.S. at 389, 99 S.Ct. at 682, 58 L.Ed.2d at 605. Thus, while declining to establish a specific gestation point as the point of viability, the Supreme Court has dictated that probability of survival outside the womb, either natural or with artificial support, is the critical factor which must be considered in assessing the constitutionali-

ty of pre-parturition intrusions by the State.

If we were to assume that a fetus in utero exhibited a minimum probability of survival not amounting to viability, and that the same probability were present in a fetus extracted during abortion, a full-term child and an eighty-five year old patient in intensive care, the viability of *Roe, Danforth* and *Colautti* would clearly not be applicable to affirmative conduct terminating that probability of survival in all four cases. It would apply *in utero;* it would not apply in the case of the struggling newborn or the geriatric case. To which category then should we assign the potential survivor of an abortion? In arriving at an answer, we must consider the basic reasons for the Supreme Court's focus on viability. Each of the cited cases recognized the fundamental right to privacy of the pregnant woman. That right is not, however, absolute or unqualified. *Roe,* 410 U.S. at 154–156, 93 S.Ct. at 727–728, 35 L.Ed.2d at 177–179; *Danforth,* 428 U.S. at 60, 96 S.Ct. at 2836, 49 L.Ed.2d at 800. In evaluating the propriety of various State intrusions into the intimate relationship between the woman and the product of her conception, the Court also recognized a State interest in the protection of prenatal life potential. *Roe,* 410 U.S. at 150, 93 S.Ct. at 725, 35 L.Ed.2d at 175. Thus, the various abortion statutes brought into question the conflicting interests of the woman and the fetus. The woman's right to privacy being fundamental in nature, long-established constitutional standards necessitated that conflicting State intrusions be predicated upon a compelling State interest. The Court recognized that as the gestational period approaches full term, the conflicting interests grow in substance and at some point during pregnancy become "compelling." *Roe,* 410 U.S. at 162–163, 93 S.Ct. at 731–732, 35 L.Ed.2d at 182. The Court has consistently, since *Roe,* found that the State's interest on behalf of the fetus reaches a compelling level when viability is attained. *Roe,* 410 U.S. at 163, 93 S.Ct. at 732, 35 L.Ed.2d at 183; *Danforth,* 428 U.S. at 61, 96 S.Ct. at 2837, 49 L.Ed.2d at 800; *Colautti,* 439 U.S. at 389, 99 S.Ct. at 682, 58 L.Ed.2d at 605. The compelling State interest in protecting prenatal life potential, from viability onward, counterbalances the fundamental privacy right of the woman, and where those are in conflict, it will support reasonable State intrusion.

Appellant is correct in stating that the three cited cases prohibit State intrusion on behalf of the fetus prior to viability. On the other hand, none of those cases forbid state civil or criminal regulation of conduct directed toward the fetus or child after removal from the mother's body, i.e., when the interests of mother and fetus are no longer in conflict. In *Colautti,* portions of the Pennsylvania Abortion Control Act were found to be unconstitutionally vague (not overbroad) because they affected the availability of abortion service and the method of abortion to be used without clearly restricting the applicability to the post-viability period. The intrusion was also pre-separation. In *Danforth,* the Court struck down a requirement of spousal consent which applied prior to viability and also invalidated a physician's standard of care requirement to preserve the life and health of the fetus regardless of viability and without restriction to the postpartum period. The Texas statutes invalidated in *Roe* were likewise applicable to pre-viable fetuses.

Once the fetus has been removed from the mother's body, there is no further conflict between its interests and those of the mother. The viability factors necessary to support a compelling State interest are inapplicable. Where the State seeks to apply criminal murder sanctions against the conduct subsequently directed toward the fetus, the issue is life, not potential for life or potential for survival. If life is present, it may not be affirmatively terminated regardless of the probability of natural or assisted survival. After separation from the mother, there is no justification for a different rule applying to a newly delivered child, whether by abortion, premature birth or full term delivery. Separation from the mother is a rite of passage beyond the

shadow of conflict with her fundamental rights.

■ The Penal Code and Family Code provisions, as well as the charge to the jury, necessitated findings of live birth (as evidenced by the enumerated statutory signs of life and others comparable) and actual life, however fragile, at the time of the Appellant's conduct. In finding the standard of care provision of the Missouri Act unconstitutionally broad in *Danforth*, the Supreme Court stated:

> And a physician's or other person's criminal failure to protect a liveborn infant surely will be subject to prosecution in Missouri under the State's criminal statutes.

*Danforth*, 428 U.S. at 83–84, 96 S.Ct. at 2848, 49 L.Ed.2d at 813. That is precisely what has occurred in the instant case, although here the alleged crime is one of commission, not omission. We further note that in *Colautti* and *Danforth*, penal sanctions for taking the life of a premature infant or one aborted alive as murder in the second degree went unchallenged and remained intact. The net effect of incorporating Family Code Section 12.05 into the murder charge in this case is the same.

The *Roe* decision stated:

> Logically, of course, a legitimate state interest in this area need not stand or fall on acceptance of the belief that life begins at conception or at some other point prior to live birth.

*Roe*, 410 U.S. at 150, 93 S.Ct. at 725, 35 L.Ed.2d at 175. The Court concluded that it need not decide when life begins to reach its result. *Roe*, 410 U.S. at 159, 93 S.Ct. at 730, 35 L.Ed.2d at 181. The Court declined to specifically define viability at a set gestational stage and did not hold that life begins at viability. Viability was solely adopted as the point of compelling State interest justifying State regulation on behalf of the life potential in the fetus. That issue is not raised by this prosecution. Appellant's criminally challenged conduct occurred after the removal of the fetus. If at that point of extraction it exhibited the statutory or comparable signs of life *and*

was alive at the time of his alleged acts, he was susceptible to conviction for murder; if not, he was entitled to acquittal. The Family Code and Penal Code provisions and their expression in the charge did not extend homicide sanctions on behalf of a nonviable fetus not constitutionally cognizable as a victim. Grounds of Error Nos. One and Three are overruled.

■ In Ground of Error No. Two, Appellant challenges the sufficiency of the evidence that the victim was alive at the time of Appellant's alleged conduct. As previously indicated, under the murder statute, the indictment and the charge given the jury, the State was required to prove not only live birth but life at the time of the Appellant's post-extraction conduct toward the fetus. While we have rejected the viability analysis of the evidence offered by Appellant in his constitutional attack on this prosecution, the underlying indicators of viability are nonetheless of probative value in assessing whether the alleged victim was alive at the time of the alleged criminal conduct. Viewed in a light most favorable to the verdict, we find the viability evidence, coupled with the other observations made by the witnesses attending the operation, sufficient to support the jury's conclusion.

At trial, witness Helen Aguilar estimated the fetal weight at five to six pounds. Witness Reynaldo Torres estimated it to be three pounds. Torres and Aguilar had given higher estimates in their earlier statements to the police and grand jury. Maria Fernandez also gave an estimate of five pounds. While Aguilar's estimate was based solely on visual observation, Torres and Fernandez both handled the plastic bag into which the child was ultimately placed. The witnesses were asked for their estimates of the weight of the child or fetus. There is no suggestion in the record that their answers included the weight of the placenta and umbilical cord. The State's expert medical witness, Dr. John Moody, Chief of Staff at Providence Memorial Hospital, testified that a typical fetus weighs two pounds and four ounces at twenty-

eight weeks and has a viability factor of twenty percent. At thirty-two weeks, an average fetus weighs three pounds and six ounces and has a viability factor of eighty percent. He stated that a three-pound fetus would have a seventy to eighty percent viability factor. Moody further testified that pronounced genital development occurs at twenty-seven to twenty-eight weeks. Contrary to the assertion in Appellant's Brief, Aguilar expressly attributed her inability to observe sexual characteristics to the position of Appellant's hands and arms in holding the child. Maria Fernandez stated that she clearly observed female genitalia. The three eyewitnesses described the curled fetal length as twelve inches, its straight length implicitly being greater. Moody testified that twelve inches alone could be attained at twenty-four to twenty-six weeks. Thus all of the fetal development evidence, viewed in a light most favorable to the verdict, supports a conclusion that the viability factor of this child was between twenty percent and eighty percent. In *Colautti*, the Supreme Court recognized the disparity of medical opinion as to assessing probability of fetal survival and the divergence of opinion as to what percentage equates to viability. *Colautti*, 439 U.S. at 396, 99 S.Ct. at 686, 58 L.Ed.2d at 609. In a footnote, the Court exemplified the variance in opinion by citing the evidence offered in that case. *Id.*, n. 15. The divergence however only spanned the range from two percent to ten percent, in contrast to the evidence in this case of twenty percent to eighty percent.

Furthermore, in the context of our previous constitutional analysis, we emphasize that viability is the point at which government intrusion is justified on the basis of a compelling interest in fetal life which has a capacity for indefinite meaningful continuance outside the womb, with or without artificial assistance. While the medical profession may differ in defining the mathematical probability of survival which equates to viability, probability of *survival* is the unit of measure. It is inappropriate to speak of survival when some life does not exist, particularly when the previously noted conflict between maternal and fetal interests has been mooted by extraction of the fetus. The murder statute is not inapplicable to one who is "5%, 10%, 20% or 80% alive." After live parturition, it is applicable to any conduct which intentionally and affirmatively terminates whatever life is present, whether the victim is eighty seconds old or eighty years old.

In this case, the fetal development evidence of "viability" did not preclude findings of live birth and continued life at the time of Appellant's conduct. In fact, this evidence provided further support for the jury's conclusion.

The primary evidence of live birth and continued life consisted of the witnesses' observations of signs of life in the child and Appellant's own conduct. In this regard, the indicators enumerated in Family Code Section 12.05(b) are merely a starting point and would be inadequate, standing alone, to support conviction. Aguilar testified that when Appellant turned the child face up and pressed the placenta over its face, she saw the rib cage expand. Dr. Moody had testified that a significant sign of life was breathing activity, exhibited mainly by the chest wall movement. In other words, expansion of the rib cage is more indicative of actual breathing than the oral, silent gasping motions which were the subject of cross-examination inquiry. On cross-examination, Aguilar was expressly asked if the chest activity could have been the result of compression by Appellant's hands. She replied that it could not. One arm and hand were supporting the child from below. Appellant's other hand was holding the placenta over the face. There was no compression of the torso.

Aguilar and Torres both testified that when Appellant immersed the child in the bucket of water, air bubbles rose. Again on cross-examination, Aguilar testified that these were breathing bubbles, unlike the bubbles produced by plunging a porous or aerated object into water. The bubbles were larger and more distinct, rose to the surface and popped.

Reynaldo Torres observed a kicking movement of one of the legs. Dr. Moody testified that movement of the extremities was another indicator of life. Torres testified that at the time of the kick, Appellant attributed it to involuntary muscle reflex. The evidence was, however, susceptible to either interpretation by the jury.

Both Torres and Aguilar testified that they observed movement of the plastic bag on the floor after the child had been placed inside. Torres conceded that it could have been caused by shifting of the placenta and fluids. Aguilar, on the other hand, described it as moving back and forth like someone breathing into a bag.

The evidence further reflected that the patient was given demerol and valium and that these substances would pass through the placenta and reduce fetal activity. Appellant obviously intended to impeach the eyewitness observations with this factor, suggesting that the described actions could not have occurred. The jury was, however, equally free to conclude that the child was alive, the signs of life did occur and that they would have been more pronounced but for the drugs.

The final category of evidence supporting the verdict consists of Appellant's own conduct. The kick-bucket was a normal item present during such surgery. Prior to this abortion, however, Appellant asked that it be filled with water. All of the witnesses testified that this had never occurred before. Both Torres and Aguilar testified that it took an unusually long time to extract the fetus, and Aguilar stated that Appellant appeared to be struggling with it. After extraction, he pressed the placenta over its face, another previously unknown practice. He then turned and immersed it in the bucket of water. Dr. Moody testified that none of these procedures were normal or had any apparent medical rationale. If Appellant were removing a nonviable, nonliving fetus, why would he delay his attention to his patient with nonproductive handling of the fetus? On the other hand, anticipation and actual observation of signs of life in the fetus would reasonably explain such behavior.

Based upon the evidence of fetal development, the signs of life observed by the eyewitnesses and the conduct of the Appellant, the jury was justified in concluding that the child was born alive and was alive until such life was intentionally and knowingly taken by the conduct of the Appellant. Ground of Error No. Two is overruled.

■ In Grounds of Error Nos. Four and Five, Appellant complains of the introduction of State's Exhibit No. Eight, a photograph of a fetus and placenta. Outside the presence of the jury and again at the time of tender in open court, the defense presented a barrage of objections including: 1) there was no showing that Appellant delivered the fetus depicted in the exhibit; 2) Appellant was not on trial for the murder of the fetus in the exhibit; 3) there was no showing of the circumstances under which the exhibited fetus was aborted; 4) the placenta is not fully shown; 5) the photograph of a corpse in one case is not admissible in the prosecution of another murder case; and 6) the State could not link the fetus in the exhibit to either the Appellant or his hospital. Objections one, two, five and six were without merit. No effort was made by the State to suggest any criminal conduct in the production of the aborted fetus in State's Exhibit No. Eight. Nor was any attempt made to link this fetus to the Appellant. It was offered solely as demonstrative evidence on issues discussed below. The court gave a proper limiting instruction to the jury that the exhibit was introduced only for the purpose of showing the relationship in size between the placenta and fetus. Objection number three was properly overruled in view of the demonstrative nature of the exhibit and the testimony of witness Reynaldo Torres that it fairly and accurately depicted a typical fetus and placenta delivered by hysterotomy at Appellant's hospital. Objection number four relates only to the weight to be attached to the exhibit and not to its admissibility.

The present complaints on appeal, also preserved by trial objection, urge that the exhibit was not relevant and that its probative value was outweighed by its inflammatory nature. The gruesomeness of a particular exhibit will not bar its admissibility if it is relevant to an issue at trial. The issue need not be contested; it need only be material. *Martin v. State*, 475 S.W.2d 265 (Tex.Crim.App.1972). If a verbal description of an item is admissible, then a photographic portrayal is as well. *Welch v. State*, 576 S.W.2d 638 (Tex.Crim. App.1979). If a gruesome exhibit is competent and relevant to a material issue at trial, it is admissible "unless it is offered solely to inflame the minds of the jury." *Martin*, 475 S.W.2d at 267.

At trial, the State argued that the photograph was necessary to rehabilitate an impeached State's witness (Reynaldo Torres) and to clarify the evidence in an area opened by the defense. In arguing Ground of Error No. Four, Appellant correctly states that Torres had not been impeached by the defense and complains of the leading nature of the redirect which provided the predicate for introduction of Exhibit No. Eight. None of the mechanics by which the photograph was introduced are assigned as distinct grounds of error on appeal. The only issues on appeal are relevance and prejudicial impact under the standards expressed in *Martin*.

We find that the photograph was relevant and of probative value to an evaluation of several material issues in the case. Helen Aguilar, Reynaldo Torres and Maria Fernandez were the only trial witnesses who actually observed the operation and the fetus which was removed. Aguilar testified that the fetus was approximately five to six pounds in weight, twelve inches in length (curled) and had brown hair. She saw the rib cage expand in a breathing manner. Torres described it as having light brown hair, and estimated its curled length at twelve inches and its weight at three pounds. Fernandez stated that it was twelve inches long in the curled position and weighed approximately five

pounds. It was well-nourished, had good skin color, hair and female sexual organs. All of this testimony was critical to the credibility of the State's only witnesses and the sufficiency of the evidence of live birth. All three witnesses testified that Appellant placed the placenta over the fetus's face after removal. Beginning with Helen Aguilar, the defense began an inquiry into the relative size and opacity of the placenta. Aguilar testified that the placenta was significantly smaller than the fetus and did not obscure her view of the signs of life. Sylvia Sanchez was also cross-examined as to the relationship between the size of the placenta and the size of the fetus. Her testimony was consistent with that of Aguilar.

Finally, in cross-examining Torres, Appellant elicited testimony that the placenta and fetus were of roughly equal size and weight, developing equally throughout gestation. Torres conceded that covering a baby with the placenta equal in size and weight would render it difficult to see its chest, facial features and sexual organs. Torres was then cross-examined as to his recollection of the size of the incision in this operation. At trial, he could not estimate but did state that six inches was customary. He acknowledged a prior deposition response describing this incision as four inches in length. Joining this testimony with his description of equal size placentas and fetuses and with the upper range of fetal weight estimations by other witnesses, the defense then questioned him as to the credibility of extracting a fourteen-pound mass through a four-inch incision.

The photograph was consistent with the testimony of Aguilar and Sanchez and the redirect testimony of Torres. The graphic portrayal provides significant probative enhancement of the verbal testimony and was relevant to material issues in the case, including the ability of the only eyewitnesses to observe the fetal development, signs of life and conduct of the Appellant towards the patient and alleged victim. Consequently, it cannot be said that the exhibit was offered solely to inflame or prejudice

the jury. Grounds of Error Nos. Four and Five are overruled.

In Ground of Error No. Six, Appellant complains that the court improperly excluded evidence offered to impeach State's witness Helen Aguilar. The evidence consisted of a tape recording of a telephone conversation between the witness and Appellant on December 15, 1981. Neither the tape nor a written transcription appear in the record, but it was sufficiently quoted during cross-examination and acknowledged by the witness to demonstrate the substance of what was excluded by the trial court's ruling.

■■■ Initially, Appellant's counsel asked if Aguilar had ever engaged in such a conversation. She denied that she had. She continued her denial even after being shown a written transcription. The tape was then played outside the presence of the jury, and Aguilar acknowledged its authenticity, identifying her voice and that of Appellant. The jury was returned and Aguilar admitted the conversation took place and that she was laughing on the tape and made statements inconsistent with her trial testimony. She admitted that in the conversation she told Appellant that she had been approached by investigators on the day of her own baby shower. In response to repeated questions by the investigators, she denied any knowledge of a bucket of water or a moving plastic bag. She further told Appellant at that time that the police had threatened her with exposure of her extra-marital affair with Appellant's son Roger. Where a witness unequivocally admits a prior statement inconsistent with his or her trial testimony, the process of impeachment is accomplished and other evidence of the prior statement is inadmissible. *Lafoon v. State,* 543 S.W.2d 617 (Tex.Crim.App.1976); *Brown v. State,* 523 S.W.2d 238 (Tex.Crim.App.1975); *Wood v. State,* 511 S.W.2d 37 (Tex.Crim.App. 1974). That rule was relied upon by the State at trial and on appeal as a basis for excluding the tape itself. An impeached witness is, however, entitled to explain his or her contradictory statements. *Stern-*

*light v. State,* 540 S.W.2d 704 (Tex.Crim. App.1976). In this case, Aguilar testified that she lied to Appellant in the December, 1981, conversation because she was afraid of his finding out the extent of her cooperation with the investigation. Her laughter was intended to cover the deception. Appellant then offered the tape, arguing then and now that this was intended to impeach her explanation of the inconsistencies and to permit the jury to directly evaluate her demeanor during the conversation for purposes of assessing her credibility.

■■■ We find no abuse of discretion in the court's restriction on the scope of cross-examination of this witness. Any effort to determine by sound whether Aguilar's laughter on the tape was sincere or deceptive would be of little probative value. The statements made by Aguilar in that conversation were available not as primary evidence of their truth but only for impeachment value by contrast with her trial testimony. Furthermore, in that conversation, she was not in any fashion relating what she recalled from her observations of the abortion, but only what she had purportedly stated to investigators nearly two years later. The sincerity or falsity of her demeanor on the tape could be directly and more completely gauged by assessing the credibility of her explanation of the inconsistencies as delivered from the witness stand.

Furthermore, the remainder of the cross-examination adequately exposed the credibility issues. Aguilar acknowledged that investigators first approached her on the day of her baby shower in April, 1981. At that time, she gave her first statement which failed to reveal any of the observations of the July 31, 1979, abortion leading to this prosecution. This was consistent with her December, 1981, conversation contained on the excluded tape. In July, 1981, she was again contacted by the investigators, at which time she began to reveal the facts to which she testified during direct examination. She also appeared before the grand jury. Appellant cross-examined Aguilar from the two written statements

and her grand jury testimony. From the quoted portions of her December, 1981, telephone conversation, it is apparent that Aguilar was conveying to Appellant that she had provided no assistance to the investigation of this case, yet all of her factual assertions relating to inquiries by the investigators seem to relate only to the April, 1981, inquiry. Of course by December, 1981, she had in fact begun to provide evidence to both the investigators and the grand jury. The entire progression of Aguilar's involvement with the investigation was directly presented to the jury through the other cross-examination evidence. The issue of her demeanor and the sincerity of her laughter on the December, 1981, tape recording is of little consequence in the context of the complete cross-examination. Whether we view the exclusion of the tape as a proper exercise of judicial discretion in placing reasonable limitations on the distance to be traveled along impeachment trails or as a harmless error in light of the other evidence, the net result is the same. Ground of Error No. Six is overruled.

In Ground of Error No. Seven, Appellant contends that the State failed to disclose exculpatory material prior to trial, despite a defense request for production. Appellant specifically refers to four items of trial testimony from three State's witnesses which he contends should have been disclosed prior to trial. All three witnesses were deposed by the defense prior to trial. After their direct testimony, the State tendered the defense each witness's prior written statements and grand jury testimony. Contrary to her trial testimony, Helen Aguilar had given an initial statement to the police that the only live birth following abortion which she had seen at Appellant's hospital occurred in 1978. Witness Sylvia Sanchez had given an early statement to the police that the abortion patient in this case was named Mirriam Adams. She did not provide that information in her later testimony to the grand jury and the indictment alleges that the victim's name was unknown to the grand jury. Witness Reynaldo Torres gave an early statement to

the police indicating that he had not seen a live birth following abortion at Appellant's facility. In addition, Torres, not a licensed physician, testified that he had conducted illegal abortions and dispensations of drugs at the clinic on his own and that he had discussed his penal liability for such acts with the investigating officers.

With regard to Torres' discussion of his potential penal liability, the present complaint is without merit. The only motion for discovery of plea bargains or grants of immunity referred exclusively to Sylvia Sanchez. Furthermore, the ultimate examination of Torres failed to disclose any police coercion, any plea bargain or any grant of immunity with regard to Torres' confessed criminal conduct.

 The remainder of this ground of error is equally without merit for a variety of reasons. Appellant filed only a general request for disclosure of "any favorable evidence," "[s]tatements of the prosecution witness which are favorable to the defendant" and "all evidence favorable to the defendant material either to guilt or to punishment." Such a request is the equivalent of no request at all. *Villarreal v. State,* 576 S.W.2d 51, 65 (Tex.Crim.App. 1978), *cert. denied,* 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114 (1979); *Thomas v. State,* 511 S.W.2d 302 (Tex.Crim.App.1974); *Jackson v. State,* 501 S.W.2d 660 (Tex. Crim.App.1973); *Feehery v. State,* 480 S.W.2d 649 (Tex.Crim.App.1972). This is particularly true in light of the nature of the allegation in the indictment in this case.

 With regard to Helen Aguilar's initial statement to police that she had seen only one live birth abortion in 1978, Appellant was already aware that Aguilar had at least initially not reported this alleged incident. During cross-examination, Aguilar was impeached with a telephone conversation which she had with Appellant on December 15, 1981. In that conversation, she told Appellant that she had been approached by investigators concerning this case but had denied any knowledge of a live-born fetus being placed first in a buck-

et of water and then in a plastic bag. Appellant had a tape recording and a written transcription of this telephone conversation. This did in fact reflect Aguilar's initial response to the investigation. Failure to disclose exculpatory evidence already in a defendant's possession does not present reversible error. *Ex parte Ramirez*, 577 S.W.2d 261 (Tex.Crim.App. 1979).

Torres' first response to the police investigation was the same as Aguilar's. He denied any knowledge of the murder of a live-born fetus after abortion. In reality, unlike the situation with Aguilar, this was not inconsistent with his trial testimony. On the witness stand, he stated that he was not a physician and declined to express an opinion as to whether the child was alive. He stated that at the time of the operation, he did not think it was alive. In any event, both of these earlier statements to police by Aguilar and Torres were fully developed at trial before the jury for impeachment and exculpatory value. There was and is no suggestion that further investigation of these "inconsistent" statements would provide further benefit to the defense. *Payne v. State*, 516 S.W.2d 675 (Tex.Crim.App. 1974).

The final item complained of was Sylvia Sanchez's early statement to the police that the victim's mother's name was Mirriam Adams. This was the only issue for which Appellant sought postponement or continuance for further investigation. Sanchez did not give this name to the grand jury, and the indictment alleged "name unknown." Appellant first became aware of Sanchez's prior assertion when provided with her written statements after direct examination. The only materiality urged in the court below was with regard to a potential fatal variance between pleading and proof.

We note that Appellant has not presented a ground of error alleging fatal variance. *See: Jordan v. State*, 520 S.W.2d 388 (Tex.Crim.App.1975). Sanchez testified that she first thought that the mother in this case was one Mirriam Adams, but she later encountered the real Mirriam Adams,

another of Appellant's patients, at a local shopping mall. She did not at all resemble the mother in this case. Sanchez realized her error prior to ever being called before the grand jury. Aguilar, Sanchez, Torres, Leticia Casillas and Maria Fernandez all observed the mother. Their composite description was of a young, Anglo woman with long, wavy blonde hair, very light-skinned, 5'6" tall, approximately six months pregnant, driving a car with New Mexico license plates. Aguilar and Casillas were never advised of her name. Sanchez initially took the patient's name but had forgotten it. Her mistake with regard to "Mirriam Adams" has already been described. Torres testified that he had believed she used a Hispanic name such as "L. Aguirre." He searched the hospital records after the investigation began but could not locate the pertinent file. Maria Fernandez initially told police the name given was "L. Aguilar." She testified that she had confused the last name with that of witness Helen Aguilar. After the operation, she saw a file marked "L. Aguirre" but was not sure it pertained to this case. Sanchez testified that nearly half the abortion patients at Appellant's hospital used fictitious names.

■■■■■ This case is distinguishable from *Jordan* which was decided upon an evidentiary variance ground. In that case, evidence was presented which affirmatively countered the indictment's allegation of lack of knowledge on the part of the grand jury. In this case, no evidence was presented which would have established the last name of the mother or victim beyond a reasonable doubt. If the grand jury had been presented all the evidence developed at trial and it still could not determine the identity of the victim, there is no variance despite the presentation of one or more suspected names, real or fictitious. *Cunningham v. State*, 484 S.W.2d 906, 911 (Tex.Crim.App.1972). We cannot find suppression of favorable evidence on the basis of mere speculation as to the prospects of locating the real mother through pretrial disclosure of three suspected names. That

undisclosed evidence *might* have helped the defense does not satisfy the federal or state prerequisites for mandatory pretrial disclosure. *Young v. State,* 644 S.W.2d 18, 21 (Tex.App.—Houston [14th Dist.] 1982, PDRR). The burden is upon the defendant to establish that the undisclosed evidence would have created a reasonable doubt which did not otherwise exist. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Green v. State,* 587 S.W.2d 167 (Tex.Crim.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Villarreal,* 576 S.W.2d at 65; *Frank v. State,* 558 S.W.2d 12 (Tex. Crim.App.1977). The present record does not support such a conclusion. Ground of Error No. Seven is overruled.

■■■ In Ground of Error No. Eight, Appellant complains of the introduction of testimony at the punishment stage from a practicing attorney, David Ferrell, a former Assistant Attorney General for the State of Texas. In addition to proper bad reputation testimony, the State elicited testimony from Ferrell that a conviction in this case would not automatically result in Appellant losing his medical license or closing his clinic. Without defense objection, the following testimony was presented:

Q: Will the fact that this Jury has returned a guilty verdict cause the Defendant, Raymond Showery, to lose automatically his medical license?

A: No.

Q: Will the fact that this Jury has returned a guilty verdict automatically shut down his medical facility?

A: No.

Q: If the Defendant, Raymond Showery, should receive probation or a short prison term, would the Defendant—or may he be allowed to continue practicing medicine?

A: During appeal?

Q: Yes, if he was on probation?

A: Yes.

Q: Would he be allowed to keep his hospital open?

Appellant then for the first time objected. This was not timely and the issue of the propriety of this testimony has not been properly preserved for review. *Marini v. State,* 593 S.W.2d 709 (Tex.Crim.App.1980); *Crocker v. State,* 573 S.W.2d 190 (Tex. Crim.App.1978).

Furthermore, the initial objection was absence of a proper foundation of legal expertise in the area of medical licensing. Upon further questioning, the witness testified that his answers were based upon personal knowledge and were not an expression of his legal opinion based upon a hypothetical situation. Outside the presence of the jury, the prosecutor advised the court that this personal knowledge was acquired during the witness's service as an Assistant Attorney General, investigating Appellant's practice, and that it specifically related to a prior conviction (pending appeal) for misapplication of fiduciary property. The fact that the personal knowledge involved a nonfinal, inadmissible conviction did not render the testimony inadmissible in this case. The jury was not advised of the prior conviction.

The primary objection on appeal is that the possible licensing consequences were beyond the proper scope of jury deliberation on punishment, analogizing to parole consideration. This was not a ground of objection at trial. *Carrillo v. State,* 591 S.W.2d 876 (Tex.Crim.App.1979); *Crocker, supra.* In fact, when the prosecutor advised the court that the intended punishment argument would include the added need for deterrence based upon Appellant's potential for continued medical practice, Appellant's counsel replied, "[s]he can argue that. She can argue what she just did to the Court."

Finally, we note that the same testimony was elicited from Appellant himself during his cross-examination without defense objection. For the foregoing reasons, Ground of Error No. Eight is without merit and is overruled.

■■■ In Ground of Error No. Nine, Appellant complains of the court's instruction to the jury concerning the authority of the

Texas Board of Medical Examiners to revoke licenses following criminal convictions. The instruction correctly recited that conviction for an offense under the Controlled Substances Act shall result in revocation but that other felony convictions simply may result in cancellation, revocation or suspension. Counsel for Appellant objected to the charge as exceeding the proper scope of jury deliberation on punishment. Once again, the analogy to parole consideration is invoked. This entire area should not have been raised. Nonetheless, it was presented during the evidentiary phase without timely proper objection by the defense. Attorney Ferrell testified that mere conviction would not automatically result in revocation of license and termination of practice. Appellant himself testified that Ferrell's statement was probably correct but emphasized the virtual certainty of the termination of his medical career.

When the trial judge overruled the objection to the instruction, he did so on the express basis of the scope of the testimony which had been permitted by both sides. As noted above, Appellant's counsel had even conceded at the bench the propriety of argument concerning potential continued practice of medicine despite conviction. Furthermore, Appellant had applied for probation and the jury was properly instructed as to the conditions which would be imposed. Among those was the duty to continue to work at suitable employment. Appellant sought to curtail by objection to the charge an evidentiary error which was not properly preserved. We believe that the court took the only acceptable course of action to provide clarity to the jury in its decision making process. Ground of Error No. Nine is overruled.

The judgment is affirmed.