**Opinion filed September 19, 2019**



In The

# Eleventh Court of Appeals

_____

## No. 11-17-00299-CR

_____

## AMBER RENEE CRAKER, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 27346A**

### M E M O R A N D U M   O P I N I O N

The jury convicted Amber Renee Craker of the first-degree felony offense of capital murder and the second-degree felony offense of tampering with evidence. The trial court assessed Appellant's punishment at confinement for life for the capital murder conviction and nineteen years for the tampering-with-evidence conviction. In a single issue on appeal, Appellant argues that the evidence is

insufficient to support her capital murder conviction because there is no evidence that she caused her infant daughter's death. We affirm.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When we conduct a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the defendant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

In the early morning hours of January 18, 2016, Appellant was admitted to the emergency room at Hendrick Medical Center in Abilene for profuse vaginal bleeding. The medical staff administered a blood test and determined that Appellant was pregnant; Appellant told medical staff that she was not aware that she was

pregnant. Dr. Preston Clay Alexander, a hospitalist who performs GYN surgeries and was on call at the time, treated Appellant and observed that she was "pale, alert, conversant, [and] in quite a bit of distress."

Dr. Alexander eventually performed emergency surgery on Appellant. Appellant was anesthetized for the surgery; Dr. Alexander testified that "it didn't take more than 20 minutes from the time [Appellant] was put to sleep until the time she was awakened." After the surgery, Dr. Alexander confronted Appellant and asked her to explain to him what had happened. Dr. Alexander testified at trial that Appellant did not answer him. In Dr. Alexander's opinion, Appellant was "fully awake" from the anesthesia, could hear his questions, and could speak. Dr. Alexander informed medical staff in the emergency room that he thought that Appellant had abandoned her baby somewhere.

Nurse Buffi Lake contacted personnel at the Abilene Police Department and informed them that there was a baby somewhere in the community that needed to be found. Jerame Shawn Montgomery, a detective with the Abilene Police Department, and other members of law enforcement were dispatched to Appellant's home in Abilene.

Around that same time, Detectives Stacey Cisneros and Jonathan Merrick with the Abilene Police Department interviewed Appellant about the events surrounding her visit to the emergency room. The first interview lasted about three hours. In this interview, Appellant initially denied knowing that she was pregnant and impliedly denied that she had given birth. Appellant variously told the detectives that she was bleeding that day because she passed a "blood clot," because she had cut herself shaving with a broken razor and a serrated knife, and because she had used the serrated knife to engage in self-mutilation of her vagina.

After the detectives questioned Appellant for two hours, Appellant finally admitted that she had given birth. Appellant explained that she had given birth to

the baby while she was alone in her bedroom and while her boyfriend and family were in another room. Appellant said that she cut the baby's umbilical cord and then "flushed it." Detective Cisneros asked her whether it was possible that the baby was "cut," and Appellant responded, "I don't know."

Detective Cisneros asked whether the baby had moved at all or was breathing; Appellant said "no" and the baby "was not moving at all." She described the baby as "blue." She also said that the baby did not move when she hit the baby on the "butt." Yet, Appellant said that the baby "tried" to take a breath and that Appellant used her own pinky to remove fluid from the baby's mouth. However, Appellant then reiterated that the baby did not move; the baby "didn't even start breathing at all" and was "pretty much dead." Because the baby was "dead blue" and because Appellant was scared that her parents would find out, Appellant flushed the baby.

The detectives interviewed Appellant a second time. During this second interview, Appellant stated that, after she had given birth to the baby, she passed out. She explained that the baby was "still attached" to her while she was passed out, although she also stated that she could not remember. She said that, when she woke up at one point, the baby did not make any noise and "wasn't even moving."

While the interviews were taking place, Detective Montgomery, Abilene Police Criminalist Wallace McDaniel, and other Abilene police officers searched Appellant's home. Officer McDaniel and Detective Montgomery observed blood in several locations throughout the home. Specifically, they observed blood throughout Appellant's bedroom and the bathroom next to Appellant's bedroom; Detective Montgomery also saw bloodstained sheets in the washing machine. Officer McDaniel and Detective Montgomery found a bloody knife and a pair of scissors on the bedroom floor. There were also bloodstains on the underside of the mattress in Appellant's bedroom; Officer McDaniel and Detective Montgomery believed that the mattress had been flipped. In the bathroom, Officer McDaniel and

4

Detective Montgomery found a pair of pliers with blood on them and also a trash can that had blood on it; Officer McDaniel took the trash can and placed it in the trunk of his vehicle for later examination.

Detective Montgomery received information from Detective Cisneros that "the baby was possibly flushed down the toilet." Detective Lynn Beard of the Abilene Police Department called master plumber Brian Sweat to Appellant's home to look inside the sewer line for a missing baby. When Sweat accessed the sewer lines from outside the home, he found a human placenta inside the lines. Thereafter, Officer McDaniel and Detective Montgomery searched the trash can that Officer McDaniel had placed in his trunk. They recovered the body of a newborn infant approximately halfway down the trash can; the infant was later identified to be the victim in this case, A.C., Appellant's daughter. Officer McDaniel saw "very obvious" injuries to A.C.'s body, specifically around her neck area.

Detective Cisneros acquired a picture of A.C.'s body and showed it to Appellant during her third interview. Appellant repeatedly and frantically explained that it was a "freak accident" and that she "did not mean to hurt [her] child" or "kill it." Detective Cisneros asked her what knife she had used, and Appellant explained: "That green one – I had a green one." Appellant explained: "It had fell" and "I went to get it and I had the knife in my hand" and "then I accidentally hit it." Appellant also said that her "hand slipped" when she tried to cut the umbilical cord; she said her hand was "wet and everything." Next, Appellant said that she tried to "save" the baby. Appellant reiterated her claim that the baby was not crying and was not moving. She said that, when she did cut the baby, she did not hear the baby make any noise.

Detective Cisneros accused Appellant of lying. Detective Cisneros said: "The reason you cut her throat was because she was moving and making noise and you didn't want . . . anybody to hear her." Appellant said: "I'm not lying."

Detective Cisneros asked why she would cut the baby's throat if the baby was not moving or breathing. Appellant responded: "Because she was not moving and so I thought it was something and I was [going to] see if she wasn't going to live or not; I didn't even know if she was dead. I thought she was already dead so I did what I did." At the end of the interview, Appellant said that she "killed [her] own freaking child." Throughout her interviews, Appellant repeatedly referred to A.C. as "it" and "the baby."

The next day, Dr. Susan Jean Roe, a deputy medical examiner with the Tarrant County Medical Examiner's Office, conducted an autopsy of A.C. During the autopsy, Dr. Roe looked for various things in an effort to determine whether A.C. was born alive or stillborn. Ultimately, Dr. Roe testified that she could not determine from the autopsy whether the baby was born alive or stillborn.

Dr. Roe first determined that A.C. had sustained a "sharp-force injury" to her neck that left a "gaping," "large" wound, severed her trachea, and punctured her left lung. After Dr. Roe cleaned the wound, she saw tissue inside the wound that indicated that A.C. had been stabbed at least three times in that area, possibly even more. Although Dr. Roe could not specify the exact type of instrument used to inflict A.C.'s injuries, she opined that the serrated blade that was found in Appellant's room was an instrument that could have caused A.C.'s wounds. Dr. Roe testified that the sharp force injuries to A.C. were intentional and not the result of a "freak accident."

Dr. Roe determined A.C.'s gestational age to be thirty-nine to forty weeks based on A.C.'s weight and physical maturation. According to Dr. Roe, A.C. was 6.8 pounds, 20.47 inches, and a "term infant." Dr. Roe plotted A.C.'s height and weight on a growth chart, and she placed A.C.'s weight in the 25th percentile and length in the 75th percentile.

Dr. Roe did not observe signs that A.C. was born prematurely. Specifically, she did not observe that A.C. had translucent skin with visible blood vessels, a

6

characteristic that Dr. Roe testified is common in premature infants. Rather, Dr. Roe observed that A.C.'s skin was "pink with minimal visible vessels."

When Dr. Roe examined A.C.'s heart, she observed a small atrial septal defect. At trial, she testified that this abnormality, which she described as "tiny holes" in the heart, does not "cause an issue during infancy or childhood" but, if left untreated, could cause a problem in adulthood. Dr. Roe also testified that children are born with this defect every day and survive to adulthood. Dr. Roe did not find any other defects or abnormalities in A.C.'s heart.

Dr. Roe also examined Appellant's placenta. Dr. Roe testified that the placenta was still in adequate condition and that she specifically examined certain bumps located on the placenta, called "cotyledons." Cotyledons, according to Dr. Roe, can cause infections and bleeding in the mother, if abnormalities are present. Dr. Roe did not find any abnormalities in the cotyledons.

Dr. Roe did not find any birth irregularities in A.C.'s pulmonary system. With regard to A.C.'s lungs, Dr. Roe determined that A.C.'s lungs were both collapsed or "atelectatic." According to Dr. Roe, A.C.'s collapsed lungs could mean one of two things. First, her collapsed lungs could mean that A.C. did not breathe very much. Second, A.C.'s collapsed lungs could mean that air entered A.C.'s lungs when one of her lungs was punctured. In any event, Dr. Roe testified that sections of A.C.'s lungs showed no definite aeration; in other words, her lungs were not "fluffy and expanded." Dr. Roe testified that this meant that she could not "tell . . . if [A.C.'s lungs] looked like they were lungs in which a baby had been breathing." However, Dr. Roe testified that this finding was consistent with a child, such as A.C., needing resuscitation at birth. Dr. Roe testified that it was not uncommon to see a baby born alive who had fluid in the nasal cavities and mouth and required suctioning to assist the baby's breathing.

As part of the autopsy, Dr. Roe placed A.C.'s lungs in water to see if they floated. Dr. Roe testified that the "float test" has been used by pathologists to determine whether an infant was born alive. Dr. Roe testified that A.C.'s lungs floated. Yet, Dr. Roe testified that this test was unreliable and that she could not scientifically say with medical certainty whether A.C. had air in her lungs.

Dr. Roe also examined A.C.'s gastrointestinal tract. Dr. Roe observed a small amount of "blood-tinged mucoid material" in A.C.'s stomach; the material contained "tiny gas bubbles." According to Dr. Roe, air could enter the stomach "[i]f a baby cries," if "a baby has lived for a long enough period of time," or if a baby is gasping or swallowing as they are leaving the birth canal. Air, according to Dr. Roe, can enter the stomach even when there is fluid in the infant's lungs, nasal cavities, and mouth. Dr. Roe also determined that A.C.'s liver, pancreas, and thyroid were normal.

Dr. Roe did not see any signs that A.C. was stillborn. Dr. Roe testified that, if a baby dies in utero and there has been enough passage of time, usually the baby starts to exhibit certain signs, such as maceration of the skin. Specifically, Dr. Roe testified that, because of the mother's body temperature, the baby's skull begins to collapse and the baby starts "losing the outer layers of [its] skin"; this usually takes hours to develop, according to Dr. Roe.

Ultimately, Dr. Roe labeled A.C.'s cause of death as "undetermined." She testified at trial that four other physicians who reviewed the case came to the same conclusion.

The State also presented evidence that Appellant had discussed her pregnancy with one of her teachers and with a school nurse. Appellant was enrolled in special education classes at Cooper High School, and at the time of the alleged offense, she was a senior in high school who was performing work at the level of a fifth or sixth grader. Jillian Carrion, a teacher at Cooper High School, testified that Appellant told

her about the pregnancy about a month prior to the date Appellant gave birth. Carrion testified that, in a separate conversation, she discussed the possibility of adoption with Appellant; she said that Appellant "seemed overwhelmed and upset" at that possibility. On cross-examination, Carrion agreed that Appellant had told her that she had a due date of June 14; Carrion thought this seemed very unlikely since Appellant "seemed much further along than that at that time."

Rebecca King, a nurse at Cooper High School, testified that she visited with Appellant at the request of Carrion. King testified that, when she asked Appellant if there was anything Appellant needed to discuss, Appellant initially stated: "[N]o." Appellant "was kind of giggling and blowing it off." King asked whether Appellant was pregnant, and Appellant replied: "Oh, yes that." King asked Appellant whether she had any paperwork to confirm the pregnancy so that King could get her signed up for pregnancy-related services. Appellant told King that she did not but that she could get it to King. King saw Appellant again on a later occasion, and Appellant told her that she had forgotten the paperwork. On cross-examination, King confirmed that Appellant told her that the due date was in June.

The State presented evidence of Appellant's mental capacity through the testimony of Jo Ann Campbell, a licensed specialist in school psychology for the Abilene Independent School District. Campbell testified at trial that she conducted psychological assessments of Appellant in October 2012 and again in October 2015. In the 2012 assessment, Campbell found that Appellant had an emotional disturbance. However, Appellant's subsequent October 2015 assessment showed that she had made considerable progress. Campbell testified that Appellant's emotional-disturbance qualification was removed after the 2015 assessment and that Appellant was placed in a learning disability category, which, according to Campbell, is not the same as intellectual disability. Campbell agreed that Appellant

9

was able to follow rules and structure at school, and Campbell found nothing to indicate that Appellant did not know right from wrong.

In this appeal, Appellant does not dispute that she intentionally stabbed A.C. Instead, Appellant disputes whether A.C. was alive at the time Appellant stabbed her. Appellant argues that a rational trier of fact could not determine beyond a reasonable doubt that A.C. was born alive and remained alive up to the point that Appellant stabbed her. As such, Appellant argues that there is no evidence that she caused A.C.'s death.

As charged in this case, a person commits the offense of capital murder if she intentionally or knowingly causes the death of an individual under ten years of age. TEX. PENAL CODE ANN. § 19.03(a)(8) (West 2019). An "individual" is a human being who has been born and is alive at the time of the alleged conduct of the defendant. *Id.* § 1.07(a)(26). To convict a defendant of murder, but-for causation must be established between the defendant's conduct and the individual's death. *See id.* § 6.04(a); *Wooten v. State*, 267 S.W.3d 289, 296 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Thus, under the murder statute and the indictment, the State was required to prove not only live birth but life at the time of Appellant's conduct toward A.C.

The El Paso Court of Appeals has addressed this issue before. In *Showery v. State*, 690 S.W.2d 689 (Tex. App.—El Paso 1985, pet. ref'd), the defendant, a physician, was convicted of the murder of a newborn baby arising out of an abortion by "hysterotomy." *Id.* at 691. The State presented evidence at trial that, after the defendant delivered the baby, the defendant suffocated the baby. *Id.* Consequently, a jury convicted the defendant of murder under Section 19.02 of the Penal Code. *Id.* On appeal, the defendant argued that the evidence was insufficient to support his conviction for murder because the State failed to prove that the baby was alive at the time the defendant was alleged to have suffocated the baby. *Id.* at 694. The court

10

held that the evidence was sufficient to support the defendant's conviction. *Id.* at 696.

The *Showery* court held that two categories of evidence primarily supported an inference of live birth and continued life. *Id.* First, witnesses to the abortion observed movement in the baby that a medical doctor testified were movements that could be consistent with life. *Id.* at 695–96. The second category of evidence was the defendant's own conduct during the abortion. *Id.* at 696. The defendant, after he delivered the baby, placed the placenta over the baby's face and placed the baby in a bucket filled with water, practices that were unusual. *Id.*

Here, the jury could have considered Appellant's conduct at the time of A.C.'s birth as evidence of life and continued life. *See id.* After Appellant gave birth to A.C., Appellant stabbed her and placed her in the trash can. If A.C. was not born alive, as Appellant claims, a reasonable factfinder could question why Appellant would stab her. Actual observation of signs of life in A.C. would reasonably explain Appellant's behavior.

The jury also could have considered Appellant's statements to police as evidence of life and continued life. *See Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) (inconsistencies in a defendant's story can provide evidentiary support for a conviction). Appellant told detectives that she did not know that she was pregnant, and she impliedly denied giving birth to a baby. When Appellant finally admitted that she had given birth to a baby, she concealed crucial facts. Appellant did not initially tell detectives that she had stabbed A.C. It was only after detectives showed her a picture of A.C.'s dead body that she admitted that she had stabbed A.C. Furthermore, she gave inconsistent explanations for why she stabbed A.C. She also said that she killed her child and that A.C. tried to take a breath. A jury could have reasonably inferred from Appellant's omissions and inconsistent statements that Appellant was attempting to conceal the true facts.

11

The jury also could have considered the medical evidence as evidence of life and continued life. Importantly, Dr. Roe did not observe any signs that A.C. was stillborn. While this is not direct evidence that A.C. was born alive, it is evidence that A.C. was not stillborn. Furthermore, Dr. Roe observed a small amount of "blood-tinged mucoid material" in A.C.'s stomach; the material contained "tiny gas bubbles." Dr. Roe testified that air can enter an infant's stomach "[i]f a baby cries," if "a baby has lived for a long enough period of time," or if a baby is gasping or swallowing as they are leaving the birth canal. Dr. Roe also testified that, from an X-ray of A.C.'s body, she observed air in A.C.'s chest cavity and possibly within her upper abdominal area. Dr. Roe testified that the presence of air can be important for determining whether an infant was born alive. Lastly, Dr. Roe did not find any health defects or abnormalities that contributed to A.C.'s death.

Considering all the evidence, a rational juror could have found that A.C. was born alive and remained alive up to the point that Appellant stabbed A.C. The jury, as the exclusive judge of the credibility of the evidence, was entitled to disbelieve Appellant's claim that A.C. was not born alive. Moreover, even if Appellant's statements were to be believed—that A.C. was "pretty much dead," that she was not moving or breathing, and that she was "dead blue,"—these facts, even if true, do not establish that A.C. was not born alive. Dr. Roe testified that it is not uncommon for a child born alive to display little or no motion, have a blue tint, and require resuscitation. Dr. Alexander testified that, in his experience delivering babies, he has seen children at birth who are relatively lifeless and blue, but still alive.

The evidence supports the jury's finding that Appellant caused A.C.'s death. The premise of Appellant's claim on appeal is that the State failed to prove by medical certainty that A.C. was born alive; however, the standard we must apply to determine whether A.C. was born alive and remained alive is the *Jackson* standard. *See Jackson*, 443 U.S. at 319. When the evidence is viewed in the light most

12

favorable to the verdict, a rational jury could have concluded beyond a reasonable doubt that Appellant committed capital murder. We overrule Appellant's sole issue on appeal.

We affirm the judgments of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


September 19, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.