THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
LEONARD HALL, Appellant.

First Department, June 21, 1990

## APPEARANCES OF COUNSEL

*Paula Sharp* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Donna Krone* of counsel *(Mark Dwyer* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

MILONAS, J. P.

This case concerns a matter of first impression in New York State; specifically, whether an individual can be convicted of the homicide of an infant who succumbs following a premature Caesarean birth necessitated by the shooting of her pregnant mother. In that regard, the facts educed at trial demonstrate the following:

On the evening of May 16, 1986, defendant Leonard Hall became engaged in a fistfight with Darryl Aaron in a grocery store at Lenox Avenue and 127th Street in Manhattan. After the two men were separated, defendant left to procure a gun. He then returned to the scene of the altercation and waited across the street until Aaron emerged from a corner pool hall. Defendant thereupon opened fire at Aaron, who managed to avoid being hit by ducking for cover. However, two of the bullets hit a passerby, Brigette Garrett, who was on her way to nearby Sylvia's Restaurant, striking her in the arm and the abdomen. Despite being seriously injured, one of the shots having penetrated her uterus and also damaging the intestinal-bowel system, she survived. Garrett was, at the time, some 28-to-32-weeks pregnant, and the shot to the stomach also severed the placenta, resulting in a lack of oxygen to the fetus, which mandated an immediate delivery. The baby, Atallia, was born by Caesarean section and lived for some 36 hours before expiring from a series of maladies attributed to prematurity and oxygen deprivation.

Two days after the incident, defendant stated to his girl-friend, Pam Smith, that he had shot a man who had "smacked" him and that the man was "through". The next evening, defendant, learning that his bullets had actually hit a pregnant woman whose baby had died, advised Pam that he intended to turn himself in. Two police officers observed the couple, arguing and shoving each other on the street, approached them and inquired as to the source of the trouble. Smith informed defendant that if he did not tell the police, she would. Accordingly, defendant, although initially denying that he was the perpetrator, disclosed that he had witnessed the shooting. He provided the police with a written statement to that effect at the station house but, almost immediately, altered his account, conceding that he was the person who had fired the gun. Moreover, defendant first claimed that he had shot at Aaron in self-defense after Aaron fired at him before

eventually admitting that Aaron was not even in possession of a gun.

On July 31, 1986, defendant was indicted for attempted (intentional) murder in the second degree with "John Doe" as the intended victim, criminal use of a firearm in the first degree and assault in the first degree (upon Brigette Garrett). A superseding indictment was filed on September 15, 1986 charging him with the foregoing three counts, as well as two counts of (intentional and depraved indifference) murder for the killing of Atallia Garrett and criminal possession of a weapon in the second degree. Defendant subsequently moved to dismiss the murder charges, urging that Atallia Garrett was not born alive and, thus, was not a legal person as statutorily mandated for a homicide conviction. The Supreme Court (William Davis, J.), however, denied the motion, concluding that Atallia was a person as defined by section 125.05 (1) of the Penal Law (134 Misc 2d 515). Following a pretrial hearing conducted in connection with defendant's motion to suppress three written statements, at the conclusion of which the court ruled that they were all admissible, he proceeded to trial. By motion of the People, the counts of attempted murder and criminal use of a firearm were dismissed. A mistrial was declared on October 18, 1987 when the jury was unable to reach a verdict. A second trial commenced on February 18, 1988, and, on this occasion, he was found guilty of the lesser included offense of manslaughter in the second degree with respect to Atallia's death, and he was also convicted of first degree assault upon Brigette Garrett and criminal possession of a weapon in the second degree.

 The instant appeal ensued, and defendant now challenges the judgment against him on a variety of grounds. First, and foremost, he insists that Garrett's baby was not a "person" as contemplated by Penal Law § 125.05 (1) and that, therefore, his conviction for manslaughter in the second degree violates certain principles of statutory construction and constitutional proscriptions and, moreover, was not supported by sufficient evidence. In addition, he asserts that his third statement should have been suppressed as the product of a delay in arraignment and that he was improperly sentenced as a second felony offender. There is no merit to any of these arguments.

The evidence at trial insofar as it relates to the Garrett baby shows that when Brigette Garrett was brought to Harlem Hospital, she was suffering from shock and the conse-

quences of her serious injuries. Abdominal X rays were taken to ascertain the size and position of her fetus. A sonogram was also performed, and it revealed the presence of a fetal heartbeat. Garrett was then rushed to the operating room where an exploratory laparotomy was undertaken. At this point, it became evident that one bullet had entered her abdomen, passing through the top of her uterus, as well as her flanks, and exited her lower back. Part of the placenta was protruding from the wound. In the view of Dr. David Bateman, the Chief of Newborn Services and attending physician, the wound to Garrett's abdomen necessitated terminating the pregnancy since the bullet had separated the placenta from the womb, thereby cutting off the baby from her mother's oxygen and nutrient supply. According to Dr. Bateman, there would have been no reason for an early delivery by Caesarean section except for the gunshot wound. A team of obstetrical surgeons delivered the baby, which was of some 28-to-32-weeks gestation (the normal period is 40 weeks) and turned her over to a team of neonatalogists. In the meantime, another group of doctors operated on Garrett.

The infant weighed some 2 pounds 5 ounces at birth. Dr. Bateman testified that 90% of premature babies of this weight survive. However, Atallia, as a result of her prematurity, compounded by oxygen starvation due to the rupture of the placenta, was very unhealthy at the moment of her removal from her mother's womb. She had an Apgar score of 1 (the system utilized by hospitals to measure a baby's condition at birth, which assigns a value of from 0 to 2 for each of 5 variables for a maximum of 10, with a score of 0 meaning the absence of life and any positive score reflecting the existence of life) because her heart rate was less than 100 beats per minute, and she was limp. Yet, there was no indication of any congenital malformation or birth defects. Since Atallia's lungs were collapsed at the time of birth, she was immediately placed on a respirator to assist her in breathing. In addition, fluid and sugar were administered intravenously, and she was attached to a cardiac monitor.

Within the first 10 minutes after delivery, Atallia's Apgar score had risen to 4. Although she was still gravely ill, she had begun circulating blood effectively on her own, and she was making some respiratory effort. At 12 hours of age, Dr. Bateman observed that she was moving her arms and legs, a sign of brain activity. Thereafter, she developed hyaline membrane disease, also known as respiratory distress syndrome,

common to premature infants. There was, moreover, testimony that this disease only occurs in a baby who is born alive and that a baby who never breathes or dies *in utero* never develops the syndrome. Dr. Bateman stated that, in his opinion, the bullet wound to Brigette Garrett, which severed the placenta and deprived the fetus of oxygen, impacted upon Atallia's development of hyaline membrane disease following birth. Dr. Tamara Bloom, an associate medical examiner, agreed that the disease could have been caused by the interruption of the flow of oxygen from the mother to the fetus.

Notwithstanding the efforts made to treat her, Atallia died 36 hours after she was born. The ensuing autopsy, which was performed on May 20, 1986, disclosed that the baby's weight had increased by 35 grams, that her lungs were heavy, airless and congested, symptomatic of hyaline membrane disease, and that she had sustained an intraventricular hemorrhage (bleeding in the brain). Dr. Bateman asserted that he believed the hemorrhage to have been formed after birth as a direct consequence of the cutoff of oxygen in the placenta. Dr. Bloom also expressed the view that the hemorrhage was of recent vintage. In any event, while Atallia's circulatory system was adequate, her organs were severely congested, a fact due to an insufficiency of oxygen. The cause of death was described as being "prematurity, Hyaline Membrane Disease, and intraventricular hemorrhage in the brain".

█ All of the doctors who treated or examined the infant were convinced that she was alive at the time of her birth and until she finally succumbed 36 hours later. Indeed, the autopsy revealed that her tissues were fresh and well preserved, and, according to Dr. Bloom, the tissues would not have been in this condition if she had been born dead. Similarly, Dr. Bloom explained that there was clear evidence of the baby's having breathed following birth as the duct connecting the major blood vessels and the heart were closed, and closure takes place only after birth. Further, Atallia's birth fits the statutory criteria for being alive. Pursuant to Public Health Law § 4130 (1): "Live birth is defined as the complete expulsion or extraction from its mother of a product of conception, irrespective of the duration of pregnancy, which, after such separation, breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached; each product of such a birth is considered live born."

Since Atallia's birth was a live one under New York law, a birth certificate was filed for her. In contrast, the definition of "fetal death" was certainly not met herein. Pursuant to section 4160 (1) of the Public Health Law, fetal death is "death prior to the complete expulsion or extraction from its mother of a product of conception; the death is indicated by the fact that after such separation, the fetus does not breathe or show any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definitive movement of voluntary muscles". Atallia had been fully expelled from her mother; she was no longer attached to the placenta, had a heartbeat and was capable of independent circulation. She also made respiratory efforts on her own and even showed signs of spontaneous movement. Under these circumstances, there can be no doubt that she was born alive despite defendant's persistent refusal to recognize such an obvious fact. Thus, he unrelentingly refers to Atallia not as a baby or infant or by name, but simply as a fetus, as if by characterizing her as a fetus on enough occasions he can transform her live birth into a miscarriage or a feticide. Defendant, of course, emphasizes that Atallia was in extremely precarious health at birth. In that regard, he points to her having been born limp, to her possessing an Apgar score of only 1 at the time, her having immediately been placed on a ventilator and to the lack of spontaneous movement at the time of birth.

Defendant, additionally, appears to advance the novel proposition that someone who requires the assistance of modern medical technology to survive, even temporarily, is not really alive. However, it is unclear whether this theory is to be applied only to the newborn or to all people irrespective of age. Perhaps defendant is suggesting that only those persons who have first been the beneficiaries of good health can be considered alive if they subsequently develop medical problems necessitating technological intervention* but that sick babies are not fully alive until they recover or their condition improves both significantly and permanently (Atallia did get better before she developed hyaline membrane disease). In short, defendant seems to claim that although Atallia may not have been completely dead at birth, she was not sufficiently

---

* The Court of Appeals has accepted that the definition of life or death is affected by advanced medical technology since it has held that a person may be declared dead when there has been an irreversible cessation of brain function notwithstanding that other organs have been technically kept alive through the use of machines (see, People v Eulo, 63 NY2d 341).

alive to be deemed a "person" under Penal Law § 125.00 *et seq.* This position is untenable. Illness is not equivalent to the absence of life, and the fact that Atallia was very sick at birth scarcely means that she was not alive. Notwithstanding defendant's concerted attempt to depict her as the victim of a feticide, resulting in a miscarriage or stillbirth, she was, by any reasonable measure, born alive.

Section 125.05 (1) of the Penal Law states that "person", "when referring to the victim of a homicide, means a human being who has been born and is alive." Manslaughter in the second degree (Penal Law § 125.15), along with the other homicide provisions, is directed at conduct whereby one person causes the death of another person. At common law, a person could not be convicted of an offense involving homicide unless the victim, including a child whose death was the result of prenatal injuries, was first born alive *(see,* Annotation, *Homicide Based on Killing of Unborn Child,* 40 ALR3d 444). This "born alive" rule was enunciated in 1949 by the New York Court of Appeals in *People v Hayner* (300 NY 171) when it reversed a conviction for first degree murder on the ground that there had not been adequate proof that the child in question had been born alive, declaring that "the People were bound to establish * * * that the child was born alive in the legal sense, that is, had been wholly expelled from its mother's body and possessed or was capable of an existence by means of a circulation independent of her own" (at 174). The drafters of the Penal Law clearly incorporated the traditional "born alive" standard in the language of the relevant statutory sections. Similarly, the enjoyment of rights under the civil law is contingent upon being born alive so that a wrongful death action, for example, may not be maintained on behalf of an unborn child *(Endresz v Friedberg,* 24 NY2d 478).

Defendant was charged with causing the death of a person who had been born and lived after birth, not with causing the death of a fetus, and he was prosecuted under this theory. The trial court never held that a fetus may be considered a "person" under the homicide provisions, nor did the Judge instruct the jury that defendant could be found guilty of causing the death of a fetus. Thus, defendant's entire discussion insofar as it pertains to the killing of a fetus is simply irrelevant. It should also be noted that this case does not involve abortion, and any attempt to equate defendant's situation with that of an individual performing or being the recipient of an abortion is unavailing.

There is absolutely nothing to indicate that by adopting the abortion provisions of article 125 of the Penal Law, the Legislature endeavored to protect persons, such as defendant, who shoot a pregnant woman in the stomach, whether deliberately or recklessly, from liability under the homicide statutes if the baby is born alive and subsequently expires from its prenatal wounds. Section 125.05 (2) of the Penal Law defines an "abortional act" as "an act committed upon or with respect to a female, whether by another person or by the female herself, whether she is pregnant or not, whether directly upon her body or by the administering, taking or prescription of drugs or in any other manner, with intent to cause a miscarriage of such female." Therefore, an essential element of an abortion is that the one carrying out the act must possess the intent to cause a miscarriage; that is, to kill the fetus prior to its birth (see, Penal Law §§ 125.40-125.55). By no reasonable construction of the law can the various abortion sections be deemed to apply to defendant herein. Indeed, the very language of Penal Law § 125.05 (1), which recites that a "person" for purposes of the homicide provisions is a human being who has been born and is alive, contradicts defendant's contention that the Legislature abrogated the "born alive" rule when it enacted the abortion statutes.

Defendant, however, is not satisfied with asserting that the "born alive" standard has been discarded in New York State; he then proceeds to urge that retaining this rule would permit the prosecution of doctors for murder or manslaughter whenever they perform an abortion in which there is a child who is born alive but later dies. Yet, Penal Law § 125.05 (3) unambiguously sets forth the type of acts that constitute justifiable abortion, and those provisions dealing with abortion and self-abortion (Penal Law §§ 125.40-125.55) specifically exempt from their purview any "justifiable abortional act[s]", which take place when, in part, they are "committed upon a female with her consent by a duly licensed physician acting (a) under a reasonable belief that such is necessary to preserve her life, or, (b) within twenty-four weeks from the commencement of her pregnancy." Notwithstanding defendant's apparent endeavor to assume the mantel of a champion of abortion rights, the reality is that acceptance of his argument in this respect would serve not to benefit women but, rather, to immunize certain types of violence against women and their babies.

Appellate courts in other jurisdictions which have reviewed the issue of whether an individual can be convicted of homi-

cide for injuries inflicted on a fetus that lead to the death of the child after it is born alive have, virtually without exception, decided this question in the affirmative. Thus, in *People v Bolar* (190 Ill App 3d 384, 440 NE2d 639), the court affirmed defendant's conviction for reckless homicide when his speeding vehicle (defendant was intoxicated at the time) struck an automobile in which a pregnant woman was a passenger. Although the woman suffered minor lacerations and abrasions, she experienced abdominal pain and was taken to a hospital where it was discovered that the placenta had been separated from the uterine wall. A Caesarean section was performed, and the baby died shortly thereafter. However, it was found to have been alive at birth despite its being flacid, breathing poorly, had only a faint heartbeat and had been assigned a 1 on the Apgar scale.

The court in *Ranger v State* (249 Ga 315, 290 SE2d 63) also concluded that an infant had been born alive and was, thus, a person within the meaning of the homicide statute in a situation in which defendant was convicted of the felony murder of an infant who survived some 12 hours after his delivery. The cause of death was hyaline membrane disease attributed to premature delivery necessitated by defendant's having shot the mother. In *United States v Spencer* (839 F2d 1341 [9th Cir], *cert denied* 487 US 1238), defendant kicked and stabbed a pregnant woman in the abdomen, requiring an emergency Caesarean section. The infant lived for 10 minutes, yet the court determined that the baby had been born alive so that the infliction of injuries upon the fetus constituted murder under 18 USC §§ 1153 and 1111. Similarly, in *Williams v State* (316 Md 677, 561 A2d 216), defendant's arrow struck a pregnant bystander, and her baby was born alive an hour before the mother's death; the child lived for 17 hours. The court therein upheld defendant's conviction for manslaughter with respect to the infant.

In another case, *State v Hammett* (192 Ga App 224, 384 SE2d 220), defendant lost control of her car and collided with a vehicle in which a pregnant woman was riding. The woman was transported to a hospital where she gave birth by emergency Caesarean section to a baby who survived for only 11 hours before succumbing to injuries received in the accident. According to the court therein, "it is not the victim's status at the time the injuries are inflicted that determines the nature of the crime * * * but the victim's status at the time of death which is the determinative factor" *(supra,* 192 Ga App, at —,

384 SE2d, at 221). Consequently, the court decided that defendant could be held liable for the charged offense of homicide by vehicle in the second degree. In *State v Anderson* (135 NJ Super 423, 343, A2d 505, *revd on other grounds* 173 NJ Super 75, 413 A2d 611), the court found that twins, having been born alive, were persons within the ambit of the homicide laws when their pregnant mother was shot, and they had to be prematurely delivered by Caesarean section. One infant lived for some 3 hours and the other for 15 hours.

Finally, while there is some dicta in *Showery v State* (690 SW2d 689 [Ct App, Tex]), to the effect that injuries inflicted prior to birth might shield the perpetrator from the operation of the homicide statutes even if the death occurs subsequent to the birth, the fact pattern in that matter is entirely distinguishable from the one before us here and does not supply much support for defendant's position in the present case. Thus, defendant therein, a physician, performed an abortion by hysterotomy in which the fetus was withdrawn alive, and he then suffocated the newborn. The court affirmed defendant's conviction for murder, observing that "[i]f life is present, it may not be affirmatively terminated regardless of the probability of natural or assisted survival" (at 693).

■ Defendant's claim that his homicide conviction is contrary to due process because the existing penal scheme did not give him proper notice of proscribed conduct and, in addition, contravenes his right to the equal protection of the laws by implementing an irrational classification is totally lacking in substance. A criminal statute violates the prohibition against ex post facto law only if it does not furnish a person of ordinary intelligence with fair notice that contemplated actions are forbidden by law *(United States v Harriss,* 347 US 612). However, it is impossible to perceive how an individual of even less than ordinary intelligence can fail to be aware that standing on a street and firing at someone in a crowd on the other side is not lawful conduct, and, in fact, defendant's behavior after the shooting in immediately divesting himself of the gun and lying low for the next several days clearly indicates that he recognized the criminality involved in his actions.

It is axiomatic that a perpetrator of illegal conduct takes his victims as he finds them, so it is entirely irrelevant whether defendant actually knew or should have known that a pregnant woman was in the vicinity and that her fetus could be wounded as a result of his actions. Clearly, it is the nature of

defendant's behavior which is at issue, not the identity of the victim(s), and it is simply ludicrous to suppose that a particular statute fails to provide fair notice of forbidden conduct if it does not expressly anticipate every possible criminal contingency. Since defendant's conduct in firing a loaded gun into a crowd on the street was of such a nature as would enable a rational person to comprehend that it is a gross deviation from the normal standard of behavior, thereby creating a substantial and unjustifiable risk that someone might be shot and injured or killed *(People v Licitra,* 47 NY2d 554), it is fatuous for him to complain that he did not receive fair notice that he was acting in a criminal manner.

Defendant's related contention that the applicable statutes make no rational distinction between offenders and nonoffenders, and, therefore, violate both his right to due process and to equal protection of the law is equally without validity. The argument in this connection seems to depend almost entirely upon an effort to blur the differences between the separate concepts of feticide, miscarriage and live birth as if, by employing these words interchangeably, defendant can convince this court that the statutory classification imposed by the Legislature does not adequately distinguish between lawful conduct and that which is proscribed. Yet, the only confusion as to which acts constitute a justifiable abortion, an illegal abortion or a homicide arises not from the language of the Penal Law which is clear and unambiguous, but from defendant's refusal to acknowledge that words are to be interpreted in accordance with their ordinary and accepted meaning *(see, People v Eulo,* 63 NY2d 341, 354).

■■ As for defendant's claim that his third written statement, in which he conceded that the object of his shooting, Darryl Aaron, was not armed, should be excluded as the product of an impermissible delay in arraignment, it need only be pointed out that there is no authority for the proposition that a lengthy arraignment process may, without more, be the predicate for granting suppression. In *People v Bowens* (129 AD2d 297, 309, *lv denied* 70 NY2d 749), this court stated that "we recognize that motions to suppress have been granted where delay was a factor, but in each such case the delay was coupled with other factors. The Court of Appeals has held in *People v Hopkins* (58 NY2d 1079, 1081 [1983]), 'absent extraordinary circumstances, a delay in arraignment is but a factor to consider on an issue of underlying involuntariness *(People v Holland,* 48 NY2d 861; *People v Dairsaw,* 46

NY2d 739)'." At any rate, the record herein indicates that defendant was taken to the prosecutor's office shortly after 6:00 P.M., some 2½ hours after the officers left him at central booking. He then stayed in the District Attorney's office until 9:00 P.M. during which time he not only discussed the events surrounding the shooting but also ate and slept. Significantly, he made no further statements between his departure from the prosecutor's office and his arraignment the following day. Consequently, defendant has not demonstrated either that his statement was obtained by means of an inordinate delay in arraignment or even that an excessively lengthy arraignment delay actually occurred. Finally, defendant's challenge to the scope of section 16-7-1 (a) of the Georgia Code Annotated, pursuant to which he was convicted for burglary in 1982, on the ground that it may not be used to enhance his sentence in the instant matter, is without merit. He is simply incorrect that the Georgia burglary statute lacks the scienter element present in the corresponding New York law (see, Ga Code Annot § 16-2-1). We have considered defendant's remaining contentions and find them to be without substance.

Consequently, the judgment of the Supreme Court, New York County (William Davis, J.), rendered on April 8, 1988, convicting defendant, following a jury trial, of manslaughter in the second degree, assault in the first degree and criminal possession of a weapon in the second degree and sentencing him as a predicate felony offender, to terms of imprisonment of 7½ to 15 years for each offense with the terms for manslaughter and criminal possession of a weapon to run consecutively, should be affirmed.

ELLERIN, WALLACH and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, rendered on April 8, 1988, unanimously affirmed.