■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HERMAN ROBINSON, Appellant. [67 NYS3d 709]—

Egan Jr., J.P. Appeals (1) from a judgment of the Supreme Court (Coccoma, J.), rendered May 28, 2015 in Schenectady County, convicting defendant following a nonjury trial of the crimes of murder in the second degree, predatory sexual assault against a child, course of sexual conduct against a child in the first degree, rape in the first degree (two counts), rape in the second degree and endangering the welfare of a child, and (2) from a judgment of said court, rendered October 5, 2016 in Schenectady County, which dismissed the count of course of sexual conduct against a child in the first degree and resentenced defendant.

On December 10, 2013, the City of Schenectady Police Department responded to a possible suicide attempt at a residence in the City of Schenectady, Schenectady County. Upon arrival, police spoke with defendant's girlfriend, who resided at the subject address, and obtained her permission to enter the residence to search for defendant, whom she believed intended to harm himself. During the ensuing search of the residence, police discovered a notebook with an apparent handwritten suicide note and, thereafter, discovered defendant unresponsive in a vehicle in the rear yard of the residence. Upon a further search of the residence, an officer read the suicide note in its entirety, wherein defendant indicated that he had been raping and sexually abusing the victim for six years, that he had impregnated her and subsequently killed the baby. As part of the ensuing investigation, police obtained a statement from the victim—then 18 years of age and attending college—wherein

she corroborated the prolonged sexual abuse referenced in defendant's suicide note, including the fact that, for a period of years, defendant had forced her to, among other things, engage in sexual intercourse and oral sexual conduct, had impregnated her, forced her to conceal her pregnancy and later killed the baby shortly after she gave birth.

Defendant was thereafter indicted and charged with murder in the second degree, predatory sexual assault against a child, course of sexual conduct against a child in the first degree, rape in the first degree (two counts), rape in the second degree, criminal sexual act against a child and endangering the welfare of a child. Defendant's motions challenging the grand jury proceedings as procedurally defective and seeking suppression of his statement made to law enforcement while in the hospital were both subsequently denied. The action was thereafter removed from County Court to Supreme Court.[1] Following a nonjury trial, Supreme Court found defendant guilty of murder in the second degree, predatory sexual assault against a child, course of sexual conduct against a child in the first degree, rape in the first degree (two counts), rape in the second degree and endangering the welfare of a child. Defendant was thereafter sentenced, as a second felony offender, to an aggregate prison term of 100 years to life. Supreme Court subsequently granted defendant's CPL article 440 motion and vacated the sentence initially imposed inasmuch as defendant had been improperly sentenced as a second felony offender. Defendant was then resentenced and again received an aggregate prison term of 100 years to life.[2] Defendant now appeals.

Defendant contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. When considering a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the People and evaluate whether "there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (*People v Bleakley*, 69 NY2d 490, 495 [1987] [citation omitted]; *see People v Ramos*, 19 NY3d 133, 136 [2012]; *People*

---

1. Immediately prior to trial, the People moved to withdraw count 6 of the indictment charging defendant with criminal sexual act in the first degree. Supreme Court granted the motion and dismissed the charge.

2. At resentencing, Supreme Court granted the People's motion to vacate defendant's conviction on count 3, course of sexual conduct against a child in the first degree, and dismissed said count inasmuch as it was a lesser included charge of count 2, predatory sexual assault against a child.

*v Warrington*, 146 AD3d 1233, 1235 [2017], *lv denied* 29 NY3d 1038 [2017]). Moreover, in assessing the weight of the evidence, where, as here, a different verdict would not have been unreasonable, this Court "must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d at 495 [internal quotation marks and citation omitted]; *see People v Danielson*, 9 NY3d 342, 348 [2007]).

Defendant initially contends that his conviction for predatory sexual assault against a child was not supported by legally sufficient evidence because there was insufficient evidence establishing that the victim was less than 13 years old at the time the alleged sexual conduct occurred. As relevant here, to establish a conviction for predatory sexual assault against a child, the People were required to prove that defendant, being more than 18 years old and "over a period of time not less than three months in duration[,] . . . engage[d] in two or more acts of sexual conduct, which include[d] at least one act of sexual intercourse [or] oral sexual conduct" with a child under age 13 (Penal Law § 130.75 [1] [b]; *see* Penal Law § 130.96). The trial evidence established that the victim was born on February 16, 1995. The victim testified that defendant began sexually abusing her when she was 11 years old while she and her family lived on Pleasant Street in Schenectady. The victim testified that the first instance of abuse occurred shortly after her biological father had been murdered in June 2006 and around the time that she started sixth grade in September 2006.[3] The victim testified that, while still living on Pleasant Street, the sexual abuse escalated after defendant showed her a pornographic video depicting a stepfather and stepdaughter engaging in sexual intercourse. The victim testified that, the following day, and continuing for years thereafter, defendant began having vaginal intercourse with her. The victim testified that, between September 2006 and September 2007, defendant had sexual intercourse with her more than 20 times and also began having her perform oral sex on him.[4] Defendant's girlfriend, who was the victim's mother, corroborated the rele-

---

3. Specifically, the victim testified that defendant entered her bedroom one night, pulled her pants down, placed a blanket over her upper body and proceeded to "fondle [her] vagina while he unzipped his pants and pleasured himself."

4. The trial evidence established that the sexual intercourse and oral sexual conduct that the victim endured continued throughout the time that she lived on Pleasant Street and prior to her 13th birthday in February 2008.

vant time frame, testifying that their family resided in a house on Pleasant Street between 2006 and 2007. The time frame also coincides with defendant's December 2013 suicide note wherein he admitted that he had been raping and sexually abusing the victim for six years. Accordingly, we find that the verdict as to count 2 was supported by legally sufficient evidence (*see People v Kalina*, 149 AD3d 1264, 1265-1266 [2017], *lv denied* 29 NY3d 1092 [2017]; *People v Sorrell*, 108 AD3d 787, 788-789 [2013], *lv denied* 23 NY3d 1025 [2014]).

Defendant also contends that the verdict as to counts 4 and 5 of the indictment charging him with rape in the first degree was not supported by legally sufficient evidence and was against the weight of the evidence based upon insufficient proof being adduced as to forcible compulsion. Although defendant failed to preserve the legal sufficiency argument with respect to count 5, "our weight of the evidence review necessarily involves an evaluation of whether all elements of the charged crime[s] were proven beyond a reasonable doubt at trial" (*People v Lancaster*, 143 AD3d 1046, 1047 [2016] [internal quotation marks and citation omitted], *lv denied* 28 NY3d 1147 [2017]). As relevant here, "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion" (Penal Law § 130.35 [1]). Forcible compulsion includes the "use of physical force" or "a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person" (Penal Law § 130.00 [8] [a], [b]). In determining whether forcible compulsion has been established, the controlling factor is the state of mind that the defendant's actions created in the victim based on a review of such relevant factors as "the age of the victim, the relative size and strength of the defendant and victim, and the nature of the defendant's relationship to the victim" (*People v Melendez*, 138 AD3d 1159, 1160 [2016] [internal quotation marks and citations omitted], *lv denied* 27 NY3d 1136 [2016]; *see People v Porter*, 82 AD3d 1412, 1413 [2011], *lv denied* 16 NY3d 898 [2011]; *People v Littebrant*, 55 AD3d 1151, 1155 [2008], *lv denied* 12 NY3d 818 [2009]).

Here, the victim testified that, prior to defendant's sexual abuse, they shared a "normal father-daughter relationship," but, beginning while the family lived on Pleasant Street, defendant began using sexual abuse as a punishment against the victim.[5] The victim recounted that if she did not perform sexual acts on defendant, he would beat her "like [she] was his size."

---

**5.** Defendant was not the victim's biological father, but he began residing with the victim's mother and the victim while the victim was still an infant.

The victim also indicated that defendant told her that if she ever told anyone about the ongoing abuse, both he and her mother would go to jail, and she reasonably believed that she and her siblings would then be placed in foster care and separated from each other.[6] The victim testified that, as she got older, defendant's threats escalated and he would tell her that, if she told anyone about the abuse, he would kill her, himself and the whole family. She testified that on one particular occasion, around the summer of 2009, defendant had beaten her with his hands and pointed a black handgun at her face, threatening to kill the entire family. This incident occurred after defendant had forced the victim to engage in oral sex on him as punishment for going roller-skating with a cousin on whom defendant alleged the victim had performed a sexual act. Notably, this incident occurred on or about the same time that the victim—who was then only 14 years old—testified that she had become pregnant as a result of having unprotected sexual intercourse with defendant as charged in count 4.[7] Accordingly, we find legally sufficient evidence was set forth establishing forcible compulsion with respect to count 4 (see People v Blackman, 90 AD3d 1304, 1306-1307 [2011], lv denied 19 NY3d 971 [2012]).

Next, we find without merit defendant's claim that the verdict as to count 1, murder in the second degree, was legally insufficient because the People did not establish that the victim gave birth to a baby. Although no body was ever discovered, the victim testified that she gave birth to a baby girl, in the bedroom of her apartment, on March 11, 2010. She testified that, as she was giving birth, defendant proceeded to pull the baby the rest of the way out of her body and then placed the baby on the floor. The victim specifically testified that she heard the baby cry and saw the baby's hands open and close, her arms move and the baby's stomach rise and fall from taking breaths. The victim testified that she then observed defendant "slam[ ] the baby's head on the floor" twice. The victim testified that defendant then briefly left the room whereupon she picked up the baby and observed the baby's stomach moving for a few seconds before it ultimately stopped. The victim testified that defendant then came back into the room and "picked up the afterbirth, [her] sweatpants and the baby and placed [all of] it

Defendant and the victim's mother subsequently had three children together.

6. The victim also recounted observing numerous instances of violence between defendant and her mother.

7. The victim testified that she learned she was pregnant during the summer of 2009, shortly after her graduation from eighth grade.

in a . . . garbage bag" and left the room again. The victim's testimony was corroborated by the testimony of a forensic pediatrician who examined the victim and opined that she had given birth, DNA evidence indicating that a blood sample taken from the victim's box spring mattress came from an unidentified Jane Doe and defendant's suicide note wherein he admitted to killing the baby. Accordingly, viewing the evidence in a light most favorable to the People, a rational person could have determined that the victim gave birth to a living, breathing baby and that defendant killed that baby in order to cover up his crimes against the victim.

Further, viewing the evidence in a neutral light and according deference to Supreme Court's credibility determinations, we find that the verdict was not against the weight of the evidence (see People v Bleakley, 69 NY2d at 495). While the victim's initial statement to police and testimony before the grand jury with regard to her age at the time that defendant started to sexually abuse her, as well as her observations of the baby at the time she gave birth, were at times conflicting or inconsistent with her trial testimony, these inconsistencies were fully developed at trial and Supreme Court, as the trier of fact in this nonjury trial, had the opportunity to hear the victim's explanations, observe her demeanor and make its own credibility determinations with regard to the testimony provided. Moreover, Supreme Court clearly credited the victim's testimony and her version of the events as they unfolded over the course of the nearly seven years that she was sexually abused.[8]

Defendant next contends that Supreme Court erred in not suppressing his suicide note inasmuch as it was obtained in violation of his constitutional rights against unlawful searches and seizures. Specifically, defendant contends that any consent that his girlfriend may have initially given to police to search the subject residence to locate defendant effectively expired when the police located defendant unresponsive in his vehicle.

---

8. We also find without merit defendant's contention that the grand jury proceeding was defective. To the extent that defendant's convictions were not against the weight of the evidence and, therefore, were necessarily supported by legally sufficient evidence (see generally People v Danielson, 9 NY3d at 348-349), any such challenge predicated upon the sufficiency of the evidence presented or instructions provided to the grand jury are precluded (see CPL 210.30 [6]; People v Gaston, 147 AD3d 1219, 1220 n 2 [2017]; People v Sorrell, 108 AD3d at 789 n 2). Moreover, our review of the grand jury minutes reveals a quorum of grand jurors was present and fails to reveal any errors in the People's presentation of the case that impaired the integrity of the proceedings or prejudiced defendant that would warrant the exceptional remedy of reversal (see People v Huston, 88 NY2d 400, 409 [1996]).

Moreover, to the extent that his girlfriend did not thereafter provide law enforcement with specific consent to search the residence until after the notebook had already been seized by police, defendant argues that its seizure cannot be justified on the basis of a consent search. We disagree. "Even in the absence of a warrant, police may lawfully search a residence where an inhabitant with apparent authority to consent to the search freely and voluntarily does so" (*People v Grillo*, 128 AD3d 1103, 1104 [2015] [citations omitted]; *accord People v Gray*, 152 AD3d 1068, 1070 [2017], *lv denied* 30 NY3d 980 [2017]). Whether such consent was freely and voluntarily obtained is determined by examining the totality of the circumstances, and great deference is afforded to the factual determinations of the trial court (*see People v Garnsey*, 288 AD2d 761, 762 [2001], *lv denied* 97 NY2d 754 [2002]).

Here, on the morning in question, defendant's girlfriend called defendant from her place of employment and became alarmed after he indicated, with slurred speech, that he had taken medication and subsequently became unresponsive while on the telephone. She then asked her supervisor to call 911, and a coworker drove her home. The police arrived at the residence to find the girlfriend on the front porch where she informed them that she resided with defendant, believed he was attempting to commit suicide and that she did not have keys on her person to enter the residence. The police then proceeded to ram open the front door and entered to find no one present, but an apparent suicide note lying on a bed.[9] Continuing out to the rear yard, the police discovered defendant lying unresponsive inside of an automobile. Paramedics who soon arrived requested that the police go back into the residence in order to locate any substances that he might have ingested and, in the course of doing so, police again viewed and ultimately seized the suicide note. As the paramedics were leaving to bring defendant to the hospital, defendant's girlfriend, desiring to go with them, gave a police officer the keys to the residence and, again, gave them permission to search it.

The initial police entry into the residence, therefore, was made with the express consent of defendant's girlfriend, a person with "apparent authority to consent to the search of the shared premises" (*People v Gray*, 152 AD3d at 1070). Despite defendant's assertion to the contrary, the temporal scope of her

---

9. When asked at trial about her reaction to the police having rammed open the door, defendant's girlfriend testified that she wanted the police to "get in to get him."

consent did not expire when the police discovered defendant in the rear yard.[10] Defendant's girlfriend acknowledged that she was aware that the police continued to go in and out of the residence through the back door during such time and, as she left the residence to be with defendant, again, by actions and words, consented to continued police presence therein. Accordingly, viewed in the totality and in consideration of the circumstances presented, Supreme Court properly denied defendant's motion to suppress the notebook.

Next, we find unavailing defendant's contention that the statement that he provided to police while in the intensive care unit of the hospital should have been suppressed because he did not knowingly and voluntary waive his *Miranda* rights. It was the People's burden to prove, beyond a reasonable doubt, that defendant's statement to police was voluntarily entered into and "that any custodial interrogation was preceded by the administration and defendant's knowing waiver of his *Miranda* rights" (*People v Muller*, 155 AD3d 1091, 1092 [2017] [internal quotation marks and citations omitted]). The voluntariness of a statement provided to law enforcement following administration of defendant's *Miranda* warnings is determined by examining the totality of the circumstances under which it was obtained (*see People v Steigler*, 152 AD3d 1083, 1083 [2017], *lv denied* 30 NY3d 983 [2017]; *People v Sabines*, 121 AD3d 1409, 1411 [2014], *lv denied* 25 NY3d 1171 [2015]), and deference is given to the credibility determinations and factual findings made by the suppression court (*see People v Neal*, 133 AD3d 920, 922 [2015], *lv denied* 26 NY3d 1110 [2016]; *People v Mattis*, 108 AD3d 872, 874 [2013], *lv denied* 22 NY3d 957 [2013]).

At the suppression hearing, officer Joseph McCabe testified that he and another detective interviewed defendant in his room in the intensive care unit of the hospital at approximately 1:30 p.m. on the afternoon of December 13, 2013. McCabe testified that he spoke with a doctor and nurse prior to interviewing defendant and was aware that defendant had been taken out of a medically induced coma the previous day. McCabe testified that, upon entering defendant's hospital room, he introduced himself, indicated to defendant that he wanted to

---

10. In any event, as there was clearly an ongoing emergency with regard to defendant's health and safety and inasmuch as the additional search was motivated not by any intent to search for evidence of a crime, but to locate the source of the intoxicants that defendant had apparently ingested, the police were justified in reentering the residence by invocation of the emergency doctrine (*see generally People v Doll*, 21 NY3d 665, 670-671 [2013], *cert denied* 572 US —, 134 S Ct 1552 [2014]; *People v Gibson*, 117 AD3d 1317, 1318-1320 [2014], *affd* 24 NY3d 1125 [2015]).

talk about what had happened and advised him of his *Miranda* rights prior to any questioning. Defendant thereafter initialed on a preprinted form next to each of the rights that he had been advised of, indicating that he understood the rights referenced therein, and signed the document. McCabe testified that he then asked defendant a number of clarifying questions, such as his name, the name of his girlfriend, the names of his children and their corresponding ages, where he lived and who the current president was, all of which defendant promptly and accurately answered. The initial interview lasted approximately one hour and, following a short break, was followed by another round of questioning that lasted approximately 40 minutes.

In response to McCabe's and the other officer's questions, defendant provided detailed information about, among other things, his upbringing and childhood and his concerns over the victim's behavior while she was away at college and provided a detailed and coherent time line of his activities on the morning leading up to his attempted suicide. Notably, defendant indicated his awareness of his *Miranda* rights by ultimately deciding to invoke his right to counsel, at which point the police terminated the interview. While there was medical evidence presented at the hearing indicating that defendant had been provided certain pain medication prior to the officers' interview and he had been agitated, combative and disoriented at certain other times during his hospital stay, the record reveals that, at the time that the officers conducted the subject interview, defendant was alert, responsive and otherwise showed no signs that his physical or mental condition was impaired to the extent that his ability to make a decision whether to speak with the officers was undermined (*see People v Balram*, 47 AD3d 1014, 1014-1015 [2008], *lv denied* 10 NY3d 859 [2008]; *People v Thompson*, 34 AD3d 931, 932-933 [2006], *lv denied* 7 NY3d 929 [2006]; *People v May*, 263 AD2d 215, 219 [2000], *lv denied* 94 NY2d 950 [2000]). Accordingly, we find no basis to disturb the suppression court's determination that defendant knowingly and voluntarily waived his *Miranda* rights and that his statements were voluntary.

Lastly, we find without merit defendant's contention that the sentence imposed was harsh and excessive. Contrary to defendant's assertion, given the duration of the sexual abuse at issue, the horrific nature of the acts committed, defendant's criminal history and his complete lack of remorse for the crimes committed, we discern nothing in the record indicating that Supreme Court sought to punish defendant for exercising his

right to trial (*see People v Shoemaker*, 119 AD3d 1073, 1077 [2014], *lv denied* 25 NY3d 992 [2015]). Nor do we find any extraordinary circumstances or an abuse of discretion by Supreme Court that would otherwise warrant a reduction of defendant's sentence in the interest of justice (*see People v Rankin*, 117 AD3d 1231, 1234 [2014], *lv denied* 24 NY3d 1087 [2014]). To the extent not expressly addressed herein, defendant's remaining contentions have been considered and determined to be without merit.

Rose, Devine, Mulvey and Rumsey, JJ., concur. Ordered that the judgments are affirmed.