People v Vega (2019 NY Slip Op 01677)





People v Vega


2019 NY Slip Op 01677


Decided on March 7, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 7, 2019

108895

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
GABRIEL VEGA, Appellant.

Calendar Date: January 10, 2019

Before: Garry, P.J., Egan Jr., Aarons, Rumsey and Pritzker, JJ.


Paul J. Connolly, Delmar, for appellant.
Mary Pat Donnelly, District Attorney, Troy (Jacob B. Sher of counsel), for respondent.
Erin Beth Harrist, New York Civil Liberties Union, New York City, and Sarah Samuels Wheeler, Reproductive Justice Clinic New York University School of Law, New York City, amici curiae.



MEMORANDUM AND ORDER
Rumsey, J.
Appeal from a judgment of the County Court of Rensselaer County (Ceresia, J.), rendered August 25, 2016, upon a verdict convicting defendant of the crimes of manslaughter in the first degree, arson in the second degree and abortion in the first degree.
On April 3, 2014, firefighters responded to an apartment fire in the City of Troy, Rensselaer County, where they found the victim's badly-burned body. The victim was in the final week of a full-term pregnancy and had been strangled — which also resulted in the death of her unborn child — before her body was doused with gasoline and set on fire. Defendant was indicted for the crimes of murder in the first degree, murder in the second degree, burglary in the first degree, burglary in the second degree, arson in the second degree, arson in the third degree and abortion in the first degree. Prior to trial, defendant moved, pursuant to CPL 210.30 (2), for County Court to review the grand jury minutes to determine whether the charges were supported by legally sufficient evidence. Upon review, County Court dismissed the charges of murder in the first degree, burglary in the first degree and burglary in the second degree and determined that the grand jury proceeding was not otherwise defective.
At the ensuing jury trial, defendant was acquitted of murder in the second degree and convicted of manslaughter in the first degree, which County Court had charged as a lesser included offense of murder in the second degree, arson in the second degree, arson in the third degree and abortion in the first degree. At sentencing, Supreme Court dismissed the charge of arson in the third degree, as a lesser included offense of arson in the second degree, and sentenced defendant to two consecutive prison terms of 25 years for his conviction of manslaughter in the first degree and arson in the second degree, to be followed by five years of [*2]postrelease supervision, and a concurrent prison term of 2&frac13; to 7 years for his conviction of abortion in the first degree. Defendant appeals.
Defendant first argues that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. He specifically contends that the evidence was legally insufficient to establish that he was the individual who committed the three crimes and, further, that the evidence was legally insufficient to establish that he committed an abortional act, a required element of his conviction of abortion in the first degree. Defendant's legal sufficiency challenges are unpreserved for our review because defense counsel's motion for a trial order of dismissal was not specifically directed at these alleged errors (see People v Gill, 168 AD3d 1140, 1140 [2019]; People v Green, 141 AD3d 1036, 1037 [2016], lv denied 28 NY3d 1072 [2016]). Nevertheless, in conducting our weight of the evidence review, we must determine whether each element of the crimes for which defendant was convicted was proven beyond a reasonable doubt (see People v Gill, 168 AD3d at 1140).
"When undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence. When conducting this review, we consider the evidence in a neutral light and defer to the jury's credibility assessments" (id. [internal quotation marks and citations omitted]). As relevant here, "[a] person is guilty of manslaughter in the first degree when . . .[, w]ith intent to cause serious physical injury to another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.20 [1]). "A person is guilty of arson in the second degree when he [or she] intentionally damages a building . . . by starting a fire, and when (a) another person who is not a participant in the crime is present in such building . . . at the time, and (b) the defendant knows that fact or the circumstances are such as to render the presence of such a person therein a reasonable possibility" (Penal Law § 150.15).
At trial, Theresa Rotsford testified that she was with the victim on April 3, 2014, the day she died, from approximately 8:00 a.m. to 9:00 a.m. and again from 12:00 p.m. to 4:30 p.m. Ginelly Santana testified that she was alone with the victim at the victim's apartment on the evening she died from approximately 8:00 p.m. to 9:45 p.m., and the apartment door was unlocked when she left. The victim's next-door neighbor, Jeffrey Cook, testified that he was in his residence at approximately 11:00 p.m. on April 3, 2014 when he "heard a loud bang noise" and immediately looked outside to see smoke emanating from a window in the victim's building. Cook exited his house and, as he began warning other residents to exit both buildings, the male driver of a vehicle that was stopped in the street asked Cook if he was looking for a man carrying a red duffel bag. Nicholas Cook, who lived with Jeffrey Cook, also testified that he heard a "loud bang" from between his building and the victim's building next door. When Nicholas Cook looked outside, he saw that a passing vehicle had stopped and he also saw a skinny "Spanish" or "ethnic" man "getting ready to run but at the same time [was] still watching the [victim's] house." When the man began to run, the Cooks pursued him in a pickup truck to no avail. Daisy Harmon, who lived in an apartment in the same building as the victim, was at home when she also heard an "explosion" around 11:00 p.m. and immediately noticed smoke in her kitchen. She went out on her balcony and saw the Cooks outside, one of whom yelled for her to leave the house. Harmon immediately went to the victim's apartment and discovered that the door was unlocked, which she found unusual because the door was "never unlocked." Harmon briefly entered the victim's apartment, but was forced to exit quickly due to "really heavy smoke." After she exited, she saw "heavy flames and smoke coming out of [the victim's] bedroom window."
The People called two additional witnesses who claimed to have seen a man running from the vicinity of the victim's apartment near the time the fire was discovered. Edward Short testified that he was driving near the victim's apartment at approximately 11:00 p.m. on that night when he saw a "thin, light skinned male running across the street" wearing a dark, hooded sweatshirt and carrying a Nike, pull-string bag. Short recalled that the man "was running extremely hard, like he was trying to get away from something or something was threatening [*3]him," and that he then saw smoke in the vicinity of the victim's building. According to Short, the man disappeared near a restaurant across the street from the victim's building. Short thereafter reported the fire to a nearby police officer. Corrine Tario similarly testified that she was driving near the victim's building around 11:00 p.m. when she nearly hit a man wearing a red hat and white T-shirt who was carrying a red backpack as he suddenly darted in front of her vehicle. Tario averred that the man stopped and looked at her "for just a brief second" and that, given the street lights and her vehicle lights, she was able to see his face. Tario identified that man as defendant. Following this incident, Tario continued driving and heard two, simultaneous "booms." After driving approximately eight blocks further, she stopped to tell two police officers that she believed someone was shot near the restaurant across from the victim's building.
Thomas Miter, a member of the Troy Fire Department who responded to the fire at the victim's apartment, testified that he located the victim's badly-burned body on the floor of a bedroom. Thomas Daus, a certified fire investigator, testified that his investigation established that an ignitable fluid was used to intentionally start the fire in the bedroom where the victim's body was found. He further concluded that the heat generated by the fire caused the windows to fail, creating the explosive sound that several witnesses described, and opined that this explosion would have occurred less than three minutes after the fire began. In addition, Daus noted that, before the fire began, the fire alarms had been disabled at a switch box located in the basement. Frank Padula, a forensic scientist for the State Police, testified that samples of the ignitable liquid taken from the victim's bedroom were identified as gasoline.
Michael Sikirica, the Rensselaer County Medical Examiner, who performed an autopsy on the victim, testified that the victim had been so severely burned that she could not be visually identified and that she was pregnant with a fetus who was at least 35 weeks old. Sikirica concluded that the victim died from "asphyxia due to strangulation" before the fire began because her lungs were "totally normal," her toxicology results showed no carbon monoxide in her blood and the soft tissue on her neck showed signs of hemorrhaging consistent with strangulation. He also concluded that the fetus, which appeared to be otherwise healthy, died from a lack of oxygen after the victim died. Daniel Myers, a second forensic scientist for the State Police, testified that he had determined, based on DNA samples taken from the fetus and defendant, that there was "a greater than 99.99 percent probability" that defendant was the father of the unborn child. He also opined that vaginal swabs taken from the victim contained defendant's DNA.
Kimberly Padin Virola testified that she had been in a three-year relationship with defendant that ended shortly before the victim's death and that Virola and defendant had a child together. Virola learned on the day that the victim died that defendant had impregnated the victim. Virola and the victim then had several telephone conversations during which they screamed at each other. Virola also sent the victim messages on social media the day she died, alleging that defendant was the father of her unborn child and threatening to fight her after the baby was born. In response to these messages, the victim denied that defendant was the father and ultimately blocked Virola from messaging her on that social media platform. Virola testified that defendant called her shortly after 11:00 p.m., sounding "like he was out of breath, like he was running," and stating that "he needed to come over, that he had done something." Virola denied defendant's request to come to her home and hung up on him. She likewise denied his request when he called again approximately 20 minutes later. Notably, she further testified that approximately two months after the fire, defendant confessed that he had been in the victim's apartment on the night of the fire and that, as they argued about Virola, he choked the victim and, upon realizing that she was dead, he poured gasoline on her and ignited a fire. She testified that defendant told her that he had obtained the gasoline from his garage and that he transported it to the victim's apartment in a two-liter soda bottle that he had placed in his book bag.
Jonathan Becker, a sergeant with the Troy Police Department, interviewed defendant three times after the victim's death. During the first interview, defendant admitted that he could be the father of the victim's unborn child, but claimed that he had not seen the victim in two months and that he had never asked her to get an abortion. Defendant also denied ever having been at the victim's apartment. During the second interview, defendant consented to DNA [*4]testing for the purpose of determining whether he was the father of the unborn child. Defendant also stated that the last time he saw the victim was at least a month before she died, and that, although he had requested that the victim get an abortion, he realized that she was unwilling to do so. During the third interview, which was recorded and played for the jury, defendant continued to assert that he did not see the victim on the day that she died. Police then confronted him with evidence that his sperm was discovered inside the victim, which would indicate that he had had sex with her within six to eight hours before she died. After continuing to deny having had sex with the victim that day, defendant stated that "[he] may have, [he] may have not." Defendant then stated that he talked to the victim at approximately 3:00 p.m. on the day that she died and that she came to his house where they had sex at approximately 4:00 p.m. When confronted with evidence showing the victim had been with a friend around 4:00 p.m., defendant responded by recalling that officers had told him that the physical evidence showed that he had sex with the victim between six and eight hours before her death.
Viewing the foregoing evidence in a neutral light, it is submitted that it would not have been unreasonable for the jury to reach a different verdict. The only evidence placing defendant at the victim's apartment on the night of her death was the testimony of Virola and Tario, whose credibility was challenged by defense counsel based on their delay in coming forward to investigators and, regarding Tario, the additional fact that no other witnesses specifically mentioned having seen her or her vehicle, which was purportedly stuck out of gear at the scene of the crime for 30 or 40 seconds. There was also no physical evidence placing defendant at the victim's residence on the night of her death. Nevertheless, we defer to the jury's credibility determinations and find that the verdict convicting defendant of manslaughter in the first degree and arson in the second degree are amply supported by the weight of the evidence.
The weight of the evidence also establishes that defendant caused the death of the victim and, as a consequence, also caused the death of her unborn child. However, as part of our weight of the evidence review, we must consider defendant's argument that the evidence does not support the verdict convicting him of abortion in the first degree because killing the pregnant mother did not constitute an abortional act, a required element of that crime. "A person is guilty of abortion in the first degree when he [or she] commits upon a female pregnant for more than [24] weeks an abortional act which causes the miscarriage of such female, unless such abortional act is justifiable pursuant to [Penal Law § 125.05 (3)]" (Penal Law former § 125.45)[FN1]. An abortional act is defined, in turn, as "an act committed upon or with respect to a female, whether by another person or by the female herself, whether she is pregnant or not, whether directly upon her body or by the administering, taking or prescription of drugs or in any other manner, with intent to cause a miscarriage of such female" (Penal Law § 125.05 [former (2)]).[FN2]
Defendant notes that the statute does not define miscarriage and urges us to find that a miscarriage occurs only where an unborn fetus dies within the first 24 weeks of pregnancy and is expelled from the uterus of a living woman. We decline to adopt the unduly narrow definition advanced by defendant. We agree with the First Department that the ordinary meaning of miscarriage is the death of a fetus prior to its birth (see People v Hall, 158 AD2d 69, 77 [1990], lv denied 76 NY2d 1021 [1990]; see also Matter of Kisha J., 225 AD2d 549, 549 [1996] [kicking a woman who was 7½ months pregnant twice in the abdomen constituted attempted abortion in the second degree], lv denied 88 NY2d 807 [1996]). Thus, the conviction for abortion in the first degree was not against the weight of the evidence because defendant's intentional strangulation of the victim necessarily resulted in the death of the unborn child. Although the Legislature recently repealed Penal Law § 125.45, our decision herein may affect prosecutions for acts that were committed prior to the effective date of the repeal. In that regard, we note that our conclusion does not raise the specter of criminalizing "justifiable abortional acts" that were [*5]performed by, or upon the advice of, a duly licensed physician based on the reasonable belief that abortion was necessary to preserve the life of the mother or that were performed within the first 24 weeks of a pregnancy (Penal Law § 125.05 [former (3)]; see People v Hall, 158 AD2d at 77).[FN3]
Next, defendant's challenges to the sufficiency of the evidence presented and the instructions provided to the grand jury are precluded by our determination that the convictions were not against the weight of the evidence, which establishes that they were necessarily supported by legally sufficient evidence (see CPL 210.30 [6]; People v Robinson, 156 AD3d 1123, 1128 n 8 [2017], lv denied 30 NY3d 1119 [2018]). Moreover, our review of the grand jury minutes establishes that "a quorum of grand jurors was present and fails to reveal any errors in the People's presentation of the case that impaired the integrity of the proceedings or prejudiced defendant that would warrant the exceptional remedy of reversal" (People v Robinson, 156 AD3d at 1128 n 8; see CPL 210.35 [6]).
We are also unpersuaded that defendant was denied the effective assistance of counsel because he failed to seek a limiting instruction and to request a missing witness charge. No limiting instruction was required regarding Virola's testimony that she did not immediately tell police about defendant's confession because he had directly threatened her (see People v Shortell, 155 AD3d 1442, 1445 [2017], lv denied 31 NY3d 1087 [2018]; People v Williams, 25 AD3d 875, 876 [2006], lv denied 6 NY3d 854 [2006]; People v King, 175 AD2d 266, 266 [1991], lv denied 79 NY2d 828 [1991]). Further, a missing witness charge was not required with respect to the passenger in Tario's vehicle and several police officers with whom she had spoken because they were expected to provide only cumulative testimony (see People v Pratt, 162 AD3d 1202, 1204 [2018], lv denied 32 NY3d 940 [2018]; People v Wheeler, 159 AD3d 1138, 1143 [2018], lv denied 31 NY3d 1123 [2018]). Defendant further contends that counsel was ineffective by failing to seek redaction of a hearsay statement from the recording of the third interview with defendant before it was played for the jury — specifically, the statement made by an officer conducting the interview that he had been told by an unnamed witness, who the record reveals was Santana, that the victim had expected defendant to come to her home after the witness left. Although counsel erred in failing to object to the hearsay statement before the recording was played for the jury, County Court promptly gave a curative instruction, ordered that the recording be redacted before it was given to the jury for deliberations and included a second curative instruction in its final charge to the jury. Thus, this error did not render counsel's assistance ineffective (see People v Howard, 305 AD2d 869, 870 [2003], lv denied 100 NY2d 583 [2003]). We further note that counsel pursued a rational trial strategy — that defendant was not at the victim's home on the day she died — vigorously impeached the testimony of the only two witnesses who placed defendant at the scene of the crime, successfully opposed the admission of additional incriminating testimony and secured an acquittal on the most serious charge, murder in the second degree. Accordingly, we conclude that the record reveals that defendant was provided with meaningful representation (see People v Benevento, 91 NY2d 708, 713-715 [1998]; People v Keener, 152 AD3d 1073, 1076 [2017]; People v Henry, 129 AD3d 1334, 1337 [2015], lv denied 26 NY3d 930 [2015]).
Finally, we reject defendant's contention that the sentence imposed by County Court was harsh and excessive given the nature of his offenses and his young age. "A sentence that falls within the permissible statutory range will not be disturbed unless it can be shown that the sentencing court abused its discretion or extraordinary circumstances exist warranting a modification" (People v Malloy, 152 AD3d 968, 971 [2017] [internal quotation marks and citations omitted], lv denied 30 NY3d 981 [2017]). Although defendant was only 20 years old at sentencing and had not been convicted of a prior crime, given the heinous nature of his actions and complete lack of remorse, we discern no abuse of discretion or extraordinary circumstances [*6]warranting a reduction of the sentence in the interest of justice (see id.; People v Babcock, 152 AD3d 962, 968 [2017], lv denied 30 NY3d 947 [2017]).
Garry, P.J., Egan Jr., Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Penal Law § 125.45 was repealed effective January 22, 2019 (see L 2019, ch 1, § 5).

Footnote 2: Subdivisions (2) and (3) of Penal Law § 125.05 were repealed, effective January 22, 2019 (see L 2019, ch 1, § 7-a).

Footnote 3: We recognize the argument, asserted by amici curiae, that a violent attack upon a pregnant woman may be prosecuted as an assault, but do not find that it requires overturning the subject conviction.