People v Croley (2018 NY Slip Op 04984)





People v Croley


2018 NY Slip Op 04984


Decided on July 5, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: July 5, 2018

109062

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
JAHMEEK CROLEY, Appellant.

Calendar Date: April 27, 2018

Before: McCarthy, J.P., Egan Jr., Devine, Mulvey and Rumsey, JJ.


Matthew C. Hug, Albany, for appellant.
P. David Soares, District Attorney, Albany (Michael C. Wetmore of counsel), for respondent.



MEMORANDUM AND ORDER
Rumsey, J.
Appeal from a judgment of the County Court of Albany County (Lynch, J.), rendered January 21, 2015, upon a verdict convicting defendant of the crime of murder in the second degree.
Defendant was indicted on charges of murder in the second degree and conspiracy in the second degree in connection with a shooting in October 2013 that resulted in the victim's death. During a joint jury trial with codefendant Jovell White-Span, the People argued that White-Span shot the victim with the intent to kill and that defendant aided him in doing so with knowledge of White-Span's intent. Following trial, defendant and White-Span were each convicted of murder in the second degree and defendant was sentenced, as a second felony offender, to a prison term of 25 years to life. Defendant appeals.
Defendant contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. "When considering a challenge to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Robinson, 156 AD3d 1123, 1124 [internal quotation marks and citations omitted], lv denied 30 NY3d 1119 [2018]). As relevant here, a person is guilty of murder in the second [*2]degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]). "[T]he intent to kill may be inferred from the surrounding circumstances and a defendant's actions" (People v Stanford, 130 AD3d 1306, 1308 [2015] [internal quotation marks and citation omitted], lv denied 26 NY3d 1043 [2015]). Inasmuch as the People did not claim that defendant fired the fatal gunshots, the charges against him were based on accessorial liability. A defendant may be criminally liable for the conduct of another person "when, acting with the mental culpability required for the commission thereof, he [or she] solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct" (Penal Law § 20.00).
The evidence at trial was largely circumstantial. Indeed, no murder weapon was found, there were no eyewitnesses who saw the killer in the act of shooting the victim and the People did not offer any evidence regarding a motive for the killing. Instead, the People, for the most part, relied on video surveillance, cell phone records and testimony from witnesses who were in the vicinity when the shooting occurred to establish a timeline of events and proffer a theory of the case. Such evidence shows that, in the early morning hours of October 19, 2013, the victim and two friends, Donald Columbus and Donovan Johnson, left a party and went to Willie's Sports Bar (hereinafter Willie's) on Washington Avenue in the City of Albany. They drove Columbus' car, which they parked on nearby Cortland Place. The victim and Columbus left Willie's approximately 30 minutes after they arrived and began to walk back to Columbus' vehicle where they intended to smoke marihuana. On their way, they encountered two other individuals who had also attended the party and were walking to Willie's — the victim's cousin, Jamil Jordan, and Steven Whittingham — with whom they had a brief conversation. Jordan joined the victim and Columbus while Whittingham, who testified that he does not use marihuana, continued walking alone down Washington Avenue toward Willie's. Shortly thereafter, while he was in the proximity of Willie's, Whittingham heard gunshots coming from the direction of Cortland Place. Columbus and Jordan likewise testified that they heard gunshots as they approached Columbus' car on Cortland Place. The victim was struck by three bullets, including one that struck him in the head. A bystander transported him to the hospital where he died without regaining consciousness.
The People's theory of the case was that White-Span deliberately sought out the victim and intentionally killed him and that defendant assisted White-Span by tracking the victim's whereabouts, transporting White-Span to the scene and acting as the getaway driver. The primary evidence in support of that theory came from surveillance video that shows the activities of the victim, defendant and White-Span, and cell phone records showing that frequent calls were made between cell phone numbers associated with defendant and White-Span during the relevant time period [FN1]. Surveillance video from outside of Willie's depicts the victim entering the bar at approximately 2:03 a.m. Defendant entered Willie's approximately five minutes later, but left after only three minutes and is depicted walking away. He placed a 16-second phone call to White-Span at 2:10 a.m., approximately two minutes after he left Willie's, and made additional [*3]brief calls to White-Span at 2:14 a.m. and 2:25 a.m.
A surveillance camera outside a nearby Stewart's store
shows a vehicle operated by defendant driving into a parking space at approximately 2:37 a.m. and defendant and White-Span exiting the vehicle. White-Span immediately pulls his hood up and quickly walks away from the vehicle, and defendant follows behind him at a distance. White-Span is seen walking on Washington Avenue towards Willie's with defendant following, still at a distance. Defendant then reenters Willie's at approximately 2:39 a.m., after being frisked by the bouncer. A person who appears to be White-Span paces and stands on the sidewalk in front of Willie's between approximately 2:42 a.m. and 2:46 a.m. Meanwhile, video from inside of Willie's taken at approximately 2:42 a.m. shows defendant talking to another individual. A series of extremely short phone calls were made between defendant and White-Span in quick succession while defendant was in Willie's, and defendant exited Willie's at 2:48 a.m.
The victim left Willie's with another individual at 3:05 a.m. and they walked away in the direction of Cortland Place. Defendant made a 10-second phone call to White-Span one minute later, at the same time that White-Span is seen walking in the same direction that was taken by the victim and his companion. It appears that the shots were fired at approximately 3:08 a.m., when the video depicts the bouncer ushering people away from the sidewalk and defendant running on the sidewalk in front of Willie's in the direction of the Stewart's parking lot; notably, defendant is the only person seen running in the video. Christopher Cornell, an Albany police detective, testified that it would have been impossible for defendant to have been the shooter because he could not have made it from Cortland Place, where the shooting occurred, to Willie's within seconds after the shots were fired. Defendant is seen returning to the vehicle at Stewart's. Between 3:10 a.m. and 3:12 a.m., there were a series of quick phone calls between defendant and White-Span. During that same two-minute period, the vehicle operated by defendant was seen proceeding down Washington Avenue before it returned to the Stewart's parking lot where a person who appears to be White-Span entered the vehicle at 3:12 a.m.
The foregoing narrative is consistent with the testimony of Columbus, Jordan and Whittingham and is further corroborated by testimony from two additional individuals who were in the area when the shooting occurred. Huie Courtney testified that he was walking on Washington Avenue at approximately 3:00 a.m. and heard approximately five gunshots while he was standing outside of the Smokin' Bull Tavern. He explained that there were initially two gunshots, which were followed by three others. According to Courtney, the gunshots sounded like they were coming from Cortland Place near Willie's. After hearing the gunshots, Courtney continued walking down the street when he observed a "short black male with shoulder-length dreads" with dark clothing and lettering on his shirt walking toward him — a description consistent with White-Span's appearance. As this individual was crossing the street, Courtney saw him "take his hood off," at which point "a skull cap or a do-rag fell off."[FN2] He testified that this individual was walking fast, with his hands in his hoody "like he was just trying to get away from the scene" and that, once he turned the corner, "he took off." Upon reaching the corner of Cortland Place, Courtney saw the victim lying in the street surrounded by blood. He also saw people outside of Willie's. He testified that he kept walking and then saw another individual who [*4]was "tall" with "dark skin" and "dark clothes" "running the opposite way" of the man with the dreadlocks.
Timothy Pfeiffenberger, a bouncer at the Smokin' Bull Tavern, testified that he heard several gunshots — two initially, followed by another three or four — from the vicinity of Cortland Place at approximately 3:00 a.m. He testified that he immediately saw a person fitting White-Span's description jog towards him from the intersection of Cortland Place and Washington Avenue while running in front of some traffic and in between some cars. During his testimony, Pfeiffenberger identified this individual as White-Span and testified that White-Span appeared to be fleeing the scene. Finally, the police interviewed White-Span and showed him the relevant surveillance video. He denied knowing the person who was identified as defendant and claimed that he did not recognize the vehicle operated by defendant. The People also submitted a video recording depicting White-Span making a phone call after police left the interview room during which White-Span can be heard saying, "this [is] Snow from the yard . . . I need you to f***ing tell Meek that they got me downtown . . . tell him it's an emergency."
When viewed in the light most favorable to the People, the circumstantial evidence set forth above was legally sufficient to support permissible inferences that White-Span intentionally shot and killed the victim, and that defendant had knowledge of White-Span's plan and intentionally aided him. "Despite the [necessary] elements being supported by some credible evidence, because a different [verdict] would not have been unreasonable, this Court must independently examine the evidence further, viewing it in a neutral light to see if the verdict is against the weight of the evidence" (People v Graham, 107 AD3d 1296, 1297-1298 [2013] [internal quotation marks and citations omitted]). Even if we accept that the evidence proved beyond a reasonable doubt that White-Span intentionally caused the victim's death by shooting him and that defendant intentionally aided White-Span in locating and isolating the victim, the evidence does not prove beyond a reasonable doubt that defendant knew — before the shooting occurred — that White-Span planned to kill the victim, because defendant could have had other equally plausible reasons for wanting access to the victim, such as robbery or assault. Similarly, the fact that White-Span did not enter Willie's does not establish that defendant knew that White-Span was armed with a gun; White-Span could have chosen not to enter for a variety of other reasons, such as being armed with a knife, possessing drugs or wanting to avoid being seen by the victim.
In light of the People's failure to establish beyond a reasonable doubt that defendant shared White-Span's intent to kill the victim, the judgment of conviction must be reversed and the indictment against defendant dismissed (see People v Akptotanor, 158 AD2d 694, 695 [1990], affd 76 NY2d 1000 [1990]; see also People v Graham, 107 AD3d at 1298). Based on the foregoing, we need not consider defendant's remaining arguments (see People v Graham, 107 AD3d at 1298).
McCarthy, J.P., Egan Jr., Devine and Mulvey, JJ., concur.
ORDERED that the judgment is reversed, on the facts, and indictment dismissed.



Footnotes

Footnote 1:The People submitted evidence that would permit the jury to conclude that defendant and White-Span were in possession of the cell phones used to make these calls. Inasmuch as we must review the evidence in the light most favorable to the People when conducting our legal sufficiency analysis, we refer to the calls as having been made between defendant and White-Span.

Footnote 2:A do-rag that the police recovered on Washington Avenue contained White-Span's DNA.